## MISSOURI PACIFIC RAILROAD COMPANY *v.* Ben L. PURDY, Lucille PURDY & MFA INSURANCE COMPANY

77-322                    567 S.W. 2d 92

Opinion delivered June 12, 1978
(In Banc)
[Rehearing denied July 10, 1978.]

*Herschel H. Friday* and *Overton S. Anderson,* by: *Overton S. Anderson,* for appellant.

*Roy G. Sanders, John Plegge* and *William R. Wilson, Jr.,* for appellees.

DARRELL HICKMAN, Justice. Ben and Lucille Purdy, from near DeWitt, were returning from a trip to Louisiana when their vehicle was involved in an accident with a Missouri Pacific Railroad Company train. The accident occurred just after dark on December 14, 1975, in Montrose, Arkansas, a small town in Ashley County. Missouri Pacific had a train stopped on a spur track across Highway 165 in Montrose. The train completely blocked the road. Purdy ran into the train causing serious damage to his vehicle and personal injuries to himself and his wife. He and his wife sued the railroad company for their injuries and his insurance company, MFA, intervened asking for reimbursement of money paid to Purdy pursuant to his insurance policy. The case went to the jury and a verdict was returned in favor of Ben Purdy for $19,800.00, Mrs. Purdy for $2,400.00, and MFA for $1,925.10. The railroad company alleges six errors on appeal. However, it is only necessary to discuss one because the trial court should have directed a verdict in favor of the railroad company.

First, a review of the undisputed facts. The accident occurred just after dark at about 5:45 p.m. The railroad crossing, a spur line across a main thoroughfare in Montrose, was on a level plane with the highway, unobstructed in any way.

The road leading to the crossing was straight and level for some distance. A proper railroad crossing sign was located on the highway. There were no flashing or sound warning signals. There were no violations of law or regulations regarding the crossing or the operation of the train at the crossing at the time of the accident. The speed limit was thirty-five miles per hour and Purdy stated that he was driving thirty to thirty-five miles per hour. Purdy and his wife both had been through Montrose before and knew of and were aware of the railroad crossing although they had never seen a train on it before the accident. Purdy testified it was "misting" rain.

The type of railroad car that Purdy struck is a chip-hopper car — it was red in color. It presents a solid profile, almost like a regular boxcar but it has no doors. Extending below the bottom of the car to within eight or twelve inches of the track are three large hoppers with doors that are used to release chips. (The profile is not exactly solid because at each end of the hopper car there is a relatively small area of open space caused by angled ends of the hopper car which facilitates in emptying the car's cargo). Purdy's vehicle ran into the car somewhat off center yet striking the solid area of the hopper car.

Purdy admitted that he had several drinks previously that day. His wife said she had a drink in her hand at the time of the accident and her husband may have had a sip of liquor just before the accident. There was no testimony that either had been drinking to the point of legal intoxication.

Purdy testified that his vehicle, a 1975 Ford LTD, was in good working order, including the lights and brakes. He said that his lights were on dim at the time of the accident. He said that he did not see the train until he was thirty or forty feet from it; his wife corroborated this statement. He testified that he applied his brakes and tried to stop as soon as possible. Both Purdy and his wife testified they simply did not see the train until they were close to it — too close to stop. Both said that they never expected to see a train on the spur track.

There were no flares out although a signalman had been posted on the other side of the train minutes before the acci-

dent — the signalman was involved in a coupling operation at the time of the accident.

Certain facts were disputed. A night marshall in Montrose, who was about a block away at the time of the accident, said that he heard Purdy's vehicle traveling in excess of fifty miles per hour, go into a skid, and then crash into the train. He said he and a state trooper measured 93 feet of skid marks. The state policeman verified this statement. The marshall testified it was not raining at the time of the accident although his investigative report indicated that it was raining. He tried to explain this by saying he had simply marked the wrong block on the report. The state policeman recalled the road was dry. There were street lights but their brilliance was limited.

Purdy said he did not recall his car going into a skid before he struck the train. An acquaintance of Purdy's, who was on the scene several hours later that evening, testified he could find no skid marks. A handwritten report of Purdy's doctor, which was taken by a nurse, had the following notation:

Patient unable to stop. Traveling about fifty miles per hour.

Mrs. Purdy, who was in the front sear next to her husband, testified that she was keeping a lookout the same as her husband and explained the accident as follows:

Well we were just driving through this little town and driving I would say around thirty or thirty-five miles when we — always when we would come to a town we would slow down to what we think was the limit going through that little town and we were just driving through there and not thinking a train being across the road and it was right there in front of us, this train, *I mean we weren't expecting it and looked up and there was a train.* That's about the only way I can describe it. [Emphasis added.]

It was the appellant's position that the crossing was not dangerous and therefore signalmen or any additional war-

ning signs, lights or gongs were not required; consequently, the appellant argues that the railroad company was not negligent and the cause of the accident was the inattention of the Purdys. The appellees argued that because it was dark, misting rain, and the accident occurred at a seldom-used spur track, a situation like that in *Hawkins* v. *Missouri Pacific Railroad Company,* 217 Ark. 42, 228 S.W. 2d 642 (1950), was created which raised fact questions for the jury.

The appellant asked for a directed verdict and the court denied it. We feel that this was error. An examination of the evidence in such an instance must be in the light most favorable to the party opposing the motion, in this case the Purdys. *Page* v. *Boyd-Bilt, Inc.,* 246 Ark. 352, 438 S.W. 2d 307 (1969). The Purdys asked for and convinced the trial court to instruct the jury that special circumstances existed which might have required the railroad company to give other warnings, and that whether these circumstances existed, and whether the railroad company used ordinary care, was a matter for the jury. Such an instruction was not justified by the facts in this case.

In a long line of railroad crossing accident cases we have held that injured plaintiffs could not recover against railroad companies when automobiles were driven into the side of trains standing still on a crossing. *Lowden* v. *Quimby,* 192 Ark. 307, 90 S.W. 2d 984 (1936); *Gillenwater* v. *Baldwin,* 192 Ark. 447, 93 S.W. 2d 658 (1936); *Kansas City Southern Ry. Co.* v. *Briggs,* 193 Ark. 311, 99 S.W. 2d 579 (1936); *Fleming* v. *Mo. & Ark. Ry. Co.,* 198 Ark. 290, 128 S.W. 2d 986 (1939); *Lloyd* v. *St. Louis S.W. Ry. Co.,* 207 Ark. 154, 179 S.W. 2d 651 (1944).

There is one exception and that is *Hawkins, supra.* In *Hawkins* we stated it was not an absolute rule of liability that the plaintiff could never recover from a railroad company when a vehicle was driven into a train that was stopped on a crossing. We reaffirmed in *Hawkins* a rule that we had laid down before:

It is the settled rule that whether failure of a railroad company to station a flagman at a crossing constitutes an omission of such care as an ordinarily pru-

dent person would use under the same or similar circumstances, is a question of fact where there are obstructions which materially hinder the view of approaching trains, provided the crossing is used frequently by the public, and numerous trains are run. Inasmuch as permanent surroundings may create a hazardous condition, the rule of care goes further and requires precautions where special dangers arise at a particular time. It is said that the obligation exists, at an abnormally dangerous crossing, to provide watchmen, gongs, lights, or similar warning devices not only for the purpose of giving notice of approaching trains, but such care is to be equally observed where the circumstances make their use by the railroad reasonably necessary to give warning of cars already on a crossing, whether standing or passing, as where a crossing is more than ordinarily dangerous because of obstructions to the view interfering with the visibility of the responsible train operatives, or those approaching the track. *Hawkins, supra* at 46.

In the *Hawkins* case we decided that considering the evidence in the light most favorable to the plaintiffs, it was conceivable the jury might find the railroad company negligent and, therefore, the case should have gone to the jury. However, the facts in the *Hawkins* case are easily distinguished from the facts here.

In *Hawkins* the tracks were raised two or three feet above the highway; the plaintiffs were driving within the speed limits at about 2:00 a.m.; the raised tracks left an open space of two feet, nine inches beneath the freight car's bottom and above the rails directly in the driver's line of vision; immediately in front of the driver was an empty box car with both doors wide open; the driver of the *Hawkins* vehicle was blinded by undimmed lights that shone through from the other side of the tracks; also, a traffic light was visible across the tracks. We quoted these facts and concluded that perhaps the railroad company unintentionally had created a situation like a trap for unwary night drivers. We concluded that in such a situation the jury might have found the railroad com-

pany negligent in not providing for signals or watchmen and directed that the case be submitted to the jury.

Although the *Hawkins* case did not overrule any of our previous decisions, we obviously had some difficulty in distinguishing it from a similar case. In the case of *Lloyd v. St. Louis S.W. Ry. Co., supra,* there was also a raised or elevated crossing; open box car doors through which lights shown immediately ahead of the driver. However, we distinguished that case because there was evidence of excessive speed on the part of the driver — 130 feet of skid marks — and the fact that the driver was thoroughly familiar with the road and the crossing.

The case before us cannot, in its most favorable light, be compared to either one of these cases. Mr. Purdy simply drove into the side of the train and the evidence is insufficient to raise a question of a hazardous crossing; moreover, the evidence considered in the appellees' most favorable light clearly places more negligence on them than the railroad company. See *Lloyd v. St. Louis S.W. Ry. Co., supra.* Consequently, a directed verdict should have been granted for the appellant railroad company.

The fact that it may have been misting rain, was after dark and that a seldom-used spur track was involved was not sufficient to create a question of a hazardous condition. The appellees' argument that Purdy's lights may have been shining under the car simply cannot be accepted. This hopper car was not an object that could have been missed by an observant, careful driver.

The rules of the road require lights that will clearly discern an object at least one hundred feet ahead of the vehicle when the lights are on dim; that a person will not drive at a greater speed than is reasonable and prudent under the conditions then existing; and, that any vehicle shall be driven at an appropriately reduced speed when approaching a railway grade crossing.

All crossings are dangerous; we have not reached the point where highways are accident-proof. We probably never

will. The motorist must be aware of the inherent dangers of automobile travel and necessarily expect hazards which we all know are there. He must be aware of the warning signs and signals of those hazards, and operate his vehicle in a careful and prudent manner for both his own safety and the safety of others.

In this case, to hold that the railroad company is negligent would be to say that when it is misting rain after dark, seldom-used spur tracks should be manned by a signalman, presumably on both sides of the train; or gongs, lights or other obstructions should be installed. Such a decision would be both unrealistic and unreasonable.

This accident, like all accidents, is unfortunate; the injured parties deserving our sincere sympathy. However, the facts pretty well speak for themselves. Considering the undisputed facts in this case, and the rules of the road, we must conclude that the cause of the accident was the Purdys' own negligence.

Reversed.

HOWARD, J., dissents.

BYRD, J., not participating.

Justice HOWARD would not dismiss the case but would reverse and remand it because he finds that an instruction given by the court was binding and therefore erroneous.