LOUISIANA AND NORTH WEST RAILROAD
COMPANY and Joe R. YOUNGBLOOD *v.* James H.
WILLIS, Administrator of the Estate of Jo Ann Willis
WILLIAMS

86-79                                                      711 S.W.2d 805

Supreme Court of Arkansas
Opinion delivered July 7, 1986
[Rehearing denied September 15, 1986.]

*Chandler & Thomason*, by: *Larry W. Chandler*, for appellants.

*Mike Kinard*, and *Acchione & King*, by: *Harold King*, for appellee.

JACK HOLT, JR., Chief Justice. Jo Ann Willis Williams was killed when she drove into the side of appellant Louisiana and North West Railroad Company's locomotive. The locomotive had stopped at the crossing of Highway 19 and appellant's track near Magnolia so that the front end blocked only her lane of traffic. The appellee, James H. Willis, administrator of the estate of Mrs. Williams, was awarded $5,000 in compensatory damages and $65,000 in punitive damages in an action against appellant for the wrongful death of Mrs. Williams. Appellant argues on appeal that both of these verdicts were clearly against the preponderance of the evidence and that the question of punitive damages should not have been submitted to the jury. Our jurisdiction is pursuant to Sup. Ct. R. 29(1)(o).

A jury verdict will be affirmed on appeal if, when viewing the evidence in the light most favorable to the appellee, there is substantial evidence to support the verdict. *E.I. DuPont de Nemours & Co.* v. *Dillaha*, 280 Ark. 477, 659 S.W.2d 756 (1983). There was substantial evidence from which a jury could conclude that L&NW Railroad Company, through its employees, negligently caused the death of Mrs. Williams, but the evidence does not support a finding of wanton and conscious disregard for the rights and safety of others. Accordingly, we affirm as to actual damages and reverse and dismiss the judgment

for punitive damages.

The testimony at trial established the following set of events which preceded the collision between Mrs. William's car and the appellant's locomotive. At approximately 9 p.m. on December 30, 1980, the appellant's train was in the process of making a switching operation at the intersection of Highway 19 and the appellant's track. The intersection was a grade crossing, meaning the crossing and the highway were on the same level. The three locomotives pulling the train were disengaged from the other cars, and the engineer pulled the locomotives completely across to the other side of the highway. He then backed the locomotives into position to be coupled with the other cars, clearing only one lane of the highway. The engineer testified that when the brakeman on the crew instructed him to stop, he set the brakes and looked up the road, at which time he realized he was still sitting partially across the highway. He said there was nothing he could do to change that until the cars were coupled. The engineer said the brakeman had initially flagged him across the highway but had gone to the back of the engine to the switch stand after the locomotive had stopped.

There were no signal lights or arms at the crossing, and after the locomotive had stopped in the intersection, there were no crew members flagging traffic, and no burning flares left on the road. Two signs were standing at the side of the highway giving notice of the crossing. The highway had no light poles or other illumination. There were lights on the locomotive which remained in the crossing, and windows through which the cab lights could be seen, but because of the angle in which the tracks crossed the highway, the locomotive's headlight faced slightly away from traffic traveling in the lane it blocked. The engineer said the bell was ringing during the entire operation.

The engineer estimated the locomotive had been stopped thirty to sixty seconds when he saw Mrs. Williams's car approaching at a "high rate of speed." He reached for the whistle cord, but the impact occurred before he could pull it. The speed limit was 35 miles per hour, and Mrs. Williams had a straight stretch of about a mile before the crossing.

The collision was also witnessed by a driver coming from the opposite direction on Highway 19. He said he rounded a curve

before the crossing and saw a set of car headlights, which disappeared almost instantly. He did not see the locomotive or its lights until the collision. He ran up to the scene, where he saw no flares burning and heard no bells.

The investigating police officer testified that it was dark at the scene and that the signs on the side of the road were faded and difficult to see. He also said it had been raining prior to his arrival at the scene.

The appellant's vice-president and the crew members all testified that no rules and regulations were broken in their switching operation that night. They stated that there is no requirement of flagging traffic or setting flares or other warnings after the crossing is occupied by a train. We have also held that it is generally not required to have signals after the train has entered the crossing as the train itself stands as a warning to drivers. *St. Louis S.W. Ry. Co.* v. *Robinson*, 228 Ark. 418, 308 S.W.2d 282 (1957); *Lloyd* v. *St. Louis S.W. Ry. Co.*, 207 Ark. 154, 179 S.W.2d 651 (1944). An exception is when the crossing is shown to be abnormally dangerous and the railroad may then have a duty to provide active warning devices. *Chicago, Rock Island & Pacific R.R. Co.* v. *Gray*, 248 Ark. 640, 453 S.W.2d 54 (1970). There was insufficient proof in this case, however, to show that the crossing was abnormally dangerous, and no jury instruction was requested on the extra precautions necessary at those crossings.

The evidence was sufficient to raise a jury question on the issue of appellant's negligence. There is no steadfast rule that there can be no liability on the part of the railroad company when a car is driven into the side of the train. The correct approach to analyzing cases of this nature is explained in *Hawkins* v. *Mo. Pac. R.R. Co.*, 217 Ark. 42, 228 S.W.2d 642 (1950):

> This Court has several times held that injured plain-tiffs could not recover against railroad companies when automobiles were driven into the side of trains standing still on a highway crossing. [citations omitted] From these cases it is conceivable that one might leap to the conclusion that this Court has laid down a rule of law that a plaintiff can never recover when his automobile is driven onto a highway-railroad crossing into the side of a train. A reading of the cases cited makes it very clear that we have

not laid down any such broad and all-embracing rule. We have not chosen to disregard the governing abstract principles of negligence and contributory negligence to the extent of saying that there never will be a crossing collision of that sort in which the railroad company or its employees are guilty of negligence, nor have we said that injured plaintiffs figuring in such collisions will always and invariably, in every case that arises, be guilty of negligence equal to or greater than that of the defendant railroad. On the contrary, in *Fleming, Admrx.* v. *Mo. & Ark. Ry. Co.*, 198 Ark. 290, 294, 128 S.W.2d 986, 988, one of the cases cited *supra*, we said:

"It is the settled rule that whether failure of a railroad company to station a flagman at a crossing, constitutes an omission of such care as an ordinarily prudent person would use under the same or similar circumstances, is a question of fact where there are obstructions which materially hinder the view of approaching trains, provided the crossing is used frequently by the public, and numerous trains are run. Inasmuch as permanent surroundings may create a hazardous condition, the rule of care goes further and requires precautions where special dangers arise at a particular time. It is said that the obligation exists, at an abnormally dangerous crossing, to provide watchmen, gongs, lights, or similar warning devices not only for the purpose of giving notice of approaching trains, but such care is to be equally observed where the circumstances make their use by the railroad reasonably necessary to give warning of cars already on a crossing, whether standing or passing, as where a crossing is more than ordinarily dangerous because of obstructions to the view interfering with the visibility of the responsible train operatives, or those approaching the track."

In *Hawkins*, the crossing was two or three feet above the rest of the highway so that approaching cars could see through to the other side of the crossing, and the doors on the boxcar were open. Traffic lights on the other side of the track were visible and as the plaintiffs approached the crossing at 2 a.m., undimmed lights shone directly in the driver's line of vision, creating the appearance that the road was clear. We held that these facts presented a

question for the jury as to whether the railroad company was negligent in not providing some form of warning to approaching traffic.

As in *Hawkins*, there was evidence here that the appellant created, "unintentionally but perhaps carelessly, something like a trap for unwary night drivers." The locomotive was blocking only a portion of the highway, with its headlights angling away from the appellee's direction of travel. A driver from the other direction stated he also did not see the train until Mrs. Williams's car appeared underneath it. Considering the darkness of the crossing, the weather, and the absence of watchmen or other appropriate warning signals during the time the locomotive partially occupied the crossing, the jury was justified in finding that the appellant was negligent.

Appellant relies heavily on *Missouri Pac. R.R. Co.* v. *Purdy*, 263 Ark. 654, 567 S.W.2d 92 (1978), where we held the trial court should have directed a verdict in favor of the defendant railroad company where the plaintiff "simply drove into the side of the train." In that case, however, the plaintiff admitted he had been drinking, a state trooper measured skid marks of 93 feet, there was testimony the plaintiff was driving in excess of 50 miles per hour in a 35 mile per hour speed zone, the accident occurred at 5:45 p.m. and, most importantly, the train presented a solid profile completely across the highway. The facts in *Purdy* clearly distinguish it from the present case.

Although the evidence justified a finding of negligence, the issue of punitive damages should never have been submitted to the jury. Punitive damages "are not a favorite of the law." *Diamond Shamrock Corp.* v. *Phillips*, 256 Ark. 886, 511 S.W.2d 160 (1974). "Negligence alone, however gross, is not sufficient to sustain such an award. *St. Louis, I.M. & S.Ry.* v. *Dysart*, 89 Ark. 261, 116 S.W. 224 (1909). Gross negligence, without willfulness, wantonness, or conscious indifference, does not justify infliction of punitive damages. *St. Louis S.W. Ry.* v. *Evans*, 104 Ark. 89, 148 S.W. 264 (1912)." *Phillips, supra.*

"Before punitive damages may be allowed it must be shown that in the absence of proof of malice or willfulness there was a wanton and conscious disregard for the rights and safety of others on the part of the tortfeasor." *Dalrymple* v. *Fields*, 276

Ark. 185, 633 S.W.2d 362 (1982).

The following quote from *Dysart supra*, illustrates the insufficiency of appellee's proof on this issue:

> The negligence consisted in failing to observe the rules laid down for the operation of trains at crossings. If these rules had been observed on the part of defendant's servants, no injury would have occurred; and the defendant is liable because of the negligence of its servants in the nonobservance of those rules. But this was gross negligence, and nothing more. There is nothing to show that the trainmen were aware of the perilous situation, or that there was any wilfullness on their part or conscious indifference to the consequences of their negligent act.

The appellant's crew members did nothing that could be termed wanton and willful, or a conscious disregard of the rights and safety of others, and there were no safety regulations or requirements violated.

Appellee asserts that certain correspondence between the appellant's vice-president and a highway department official, in which the highway department initiated plans for placing signals at the crossing nine months before the accident occurred, shows a conscious disregard for safety by appellant. The plans had temporarily stalled because federal funding for the project had not yet been authorized. There was no other showing that this crossing was known to be or even was abnormally dangerous, so that warning devices would be required. The fact that appellant elected to wait for the funding rather than finance the signals cannot be said to be willful and wanton negligence. Railroads are obviously not required to have active warning devices at every crossing.

For these reasons, the case is reversed in part with instructions to enter judgment only for compensatory damages.

Affirmed in part and reversed in part.