DONGARY HOLSTEIN LEASING, INC. *v.* James C. COVINGTON, d/b/a WHISPERING PINES DAIRY

87-40                                      732 S.W.2d 465

Supreme Court of Arkansas
Opinion delivered July 20, 1987
[Rehearing denied September 14, 1987.*]

*Hays, J., would grant rehearing.

*Jackson, Jackson, Loving & Gutman*, by: *Gary D. Jackson*; and *Brown & Kesl*, by: *Marjorie M. Kesl*, for appellant.

*Scott R. Donaho*, for appellee.

JOHN I. PURTLE, Justice. The appellee was awarded a jury verdict on his negligence counterclaim to a complaint for breach of contract. Motions for J.N.O.V. and for a new trial were denied. Arguments for reversal are: (1) that the verdicts were inconsis-

tent; (2) that the verdicts were not supported by the evidence; (3) that the evidence was insufficient to support the award of punitive damages; (4) that the trial court erred in denying the motion for J.N.O.V.; and (5) that the trial court erred in denying the motion for a new trial. We do not find reversible error except that there was no evidence to support the award of punitive damages against the appellant.

On January 26, 1983, appellant and appellee entered into contracts for the lease of thirty holstein milch cows. On March 25, 1983, appellant and appellee entered into a second contract for the lease of an additional thirty cows. Each lease was payable in monthly installments of $1,384.50 over a period of sixty months. The appellee was allowed to select each batch of thirty cows from herds owned by Bookout Holsteins, Inc., from whom appellant purchased the cows. Appellant, Dongary Holstein Leasing, Inc., never took physical possession of the cattle.

On January 26, 1983, the appellee and his wife and father went to Texas for the purpose of discussing a contract for lease of dairy cows to be used in appellee's dairy operation in Lonoke County, Arkansas. John Newton, president of Dongary, met them and drove them to Dublin, Texas, where they selected thirty milch cows from a herd owned by Bookout. The cows were sold on the spot to Dongary, which in turn leased them to appellee. Most, if not all, of the papers were signed at the Bookout location. Some of the forms had been prepared by appellant's home office in Denver, Colorado. Dongary had previously purchased some 300 dairy cows from Bookout and leased them to other parties.

A second batch of thirty cows was subsequently selected by the appellee from Bookout's dairy operation in Indiana. Although John Newton arranged for the Covingtons to go to Indiana to select the other cows and paid for at least a part of their expense in making the trip, he did not personally accompany them to Indiana for selection of the second group of holsteins. The second group of cows was the basis for the March 25, 1983, lease agreement.

One of the cows selected from the Texas herd subsequently turned up with brucellosis. This cow was replaced by Bookout and knowledge of the incident was extended to Mr. Newton. About a half a dozen of the cows selected from the Bookout herd in

Indiana turned out to be "bangy", i.e. either having brucellosis or carrying the disease. These cows were also replaced by Bookout.

The testimony is sharply divided as to what happened between the time the first diseased cow was discovered and the time the appellee notified the appellant to come get the cows because he could not longer make the payments on the lease. The appellee and his witnesses testified that after discovery of the diseased cow it was necessary to start testing (bleeding) the cows routinely and that such procedure caused the cows to reduce production of milk. The chief result of a cow with brucellosis is that she will abort. When a cow aborts she does not ordinarily commence producing milk as she would if she calved in a normal manner. In many instances the cows do not breed back as soon after aborting as they would after dropping a calf in a normal manner. Since she does not come into production until she calves, this slows up the dairy business. Evidence indicated that the prolonged feeding of cows, which were either not in production or in reduced production, contributed to appellee's financial inability to continue paying on the lease.

The appellee notified the appellant in November, 1983, to come pick up the cows. The cows were not picked up by the appellant until June of 1985. During this period of time the appellant, according to testimony presented at the trial, continued to lose money as a result of the brucellosis being brought into his herd from the Texas and Indiana operations of Bookout.

The briefs in this case are of minimal help in resolving the issues. It is fairly obvious from the record and the briefs that Covington stopped paying on the lease in the belief that he was justified in doing so because he felt appellant was responsible for his inability to comply with the terms of the lease.

The appellee stopped making payments on the lease in November of 1983, but subsequently resumed making payments pursuant to an agreement made in April of 1984. After the appellee again stopped payments, the appellant exercised an option to have the cows returned and to sue for damages for breach of contract. The amount they claimed under the contract, about $140,000, was the amount of the two leases less the amount paid by the appellee. The appellee answered and counterclaimed for damages based on negligence. The jury returned a verdict

finding that appellee had breached the contract but that appellant's damages were zero. The jury also found that appellee was damaged as a result of appellant's negligence in the amount of $75,000. The jury awarded appellee punitive damages in the additional amount of $15,000.

As to the award of punitive damages, we will simply point out that punitive damages should be imposed to punish a wrongdoer and to deter others from similar conduct. Arkansas Model Instructions 2217 states that before punitive damages may be imposed, there must be a finding that the defendant "knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in the reckless disregard of the consequences from which malice may be inferred." In the recent case of *Louisiana and Northwest Railroad Company, et al.* v. *Willis Administrator*, 289 Ark. 410, 711 S.W.2d 805 (1986), we discussed some of the same issues as we must decide in this case. In that case we reversed and dismissed the punitive damages award and affirmed the award for compensatory damages. We also reaffirmed our often repeated holding on matters of punitive damages where we stated: "Negligence alone, however gross, is not sufficient to sustain such an award." Additionally, we stated: "Gross negligence, without willfulness, wantonness, or conscious indifference, does not justify infliction of punitive damages." We find no evidence in the record to support the award of the punitive damages.

It is undisputed that Covington refused to continue making the lease agreement payments. His reason for not doing so was that he did not have the money as a result of the disease-infected cattle being introduced into his herd. This, he says, was caused by the negligence of the appellant in allowing the diseased cattle from Bookout to be transferred to the appellee. In effect, he is saying that he stopped paying on the contract because of the prior breach by the appellant. We hold that there was sufficient evidence to support a recovery against the appellant because of negligence on its part.

In this case the facts are not materially disputed; the disagreement is on matters of the application of law to the facts. We have dealt with situations where one party breaches a

contract and defends on the grounds that the other party did so first. In *TXO Productions Corporation* v. *Page*, 287 Ark. 304, 698 S.W.2d 791 (1985), we stated: "If the plaintiff's breach is material and sufficiently serious, the defendant's obligation to perform may be discharged." A relatively minor failure of performance on the part of one party does not justify the other in seeking to escape any responsibility under the terms of the lease or contract. See *Henslee* v. *Mobley*, 148 Ark. 181, 230 S.W.2d 17 (1921). We hold that there was sufficient evidence from which the jury could have concluded that the defendant's obligation to perform was discharged by the plaintiff's prior material breach of the contract.

■ Negligence is defined in AMI 301, as a "failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under the circumstances similar to those shown by the evidence in this case." Under another instruction (AMI 303) ordinary care is defined to mean "the care a reasonably careful person would use under circumstances similar to those shown by the evidence in this case." We have put these instructions into practical use in many cases. In the case of *Version Allsteel Press Co.* v. *Garner, et ux.*, 261 Ark. 133, 547 S.W.2d 411 (1977), we stated: "Of course, one is negligent when he does something that a person of ordinary prudence would not have done in the same or similar circumstances (or fails to do something as such a person would have done), but in addition, it must develop that the negligence was a proximate cause of the injury, and that injury was foreseeable." Before a negligent act may be used as the basis to recover damages there must be a showing that the negligent act proximately caused the damages sustained and that such damages were reasonably foreseeable. *St. Mary's Hospital, Inc.* v. *Bynum*, 264 Ark. 691, 573 S.W.2d 914 (1978).

■ Negligence growing out of the duties relating to a contract may serve as a basis for recovery. In 57 Am Jur 2d *Negligence* § 47, it is stated:

Although, as a general rule, mere failure to perform a contract cannot serve as the basis of a tort liability for negligence, and there are authorities which state that liability for negligence in the violation of a duty imposed by

a contract involves misfeasance rather than nonfeasance, the tendency has been to recognize that liability for negligence may be predicated upon a lack of due care in failing to act as well as upon a negligent performance. The sound rule appears to be that where there is a general duty, even though it arises from the relation created by, or from the terms of, a contract, and that duty is violated, either by negligent performance or negligent nonperformance, the breach of the duty may constitute actionable negligence. A claim for damages based on negligence arising out of breach of contract must necessarily be determined by reference to the contract which created the duty, expressly or impliedly.

We, therefore need to examine the duties owed by the appellant.

■ There was sufficient evidence that the appellee's inability to perform was a result of the prior negligence on the part of the appellant in either failing to see that the cows were not diseased or in failing to discover and report the fact to the appellee. The appellant admits that it had knowledge of brucellosis in the Bookout herds before the second load of thirty cows were selected by the appellee. Certainly the brucellosis was a material factor in the failure of the appellee's dairy business. It was a factual question as to whether or not the disease came into appellee's herds by reason of the negligence of the appellant.

On the finding for the appellant on the breach of contract and assessing the damages at zero, we cannot say that there was no basis in fact for such action by the jury. The court questioned the jury in order to determine their intent. We have long held that if the meaning of the jury can be clearly discerned from the verdict it ought not be set aside. *Barham* v. *Rupert Crafton*, 290 Ark. 211, 718 S.W.2d 432 (1986). Clearly, the jury found that the appellee's performance was discharged by the negligence of the appellant.

■ We find that the evidence was insufficient to support the verdict for punitive damages and reverse and dismiss that part of the judgment. The J.N.O.V. was properly denied because, as we have pointed out, the evidence was sufficient to support the verdict and judgment for compensatory damages. The motion for a new trial was also properly denied for the reasons already stated.

Newbern, J., dissents.