760 P.2d 551

Tana RANBURGER, Plaintiff/Appellee,

v.

SOUTHERN PACIFIC TRANSPORTA-
TION COMPANY, a Delaware corpora-
tion, National Railroad Passenger Cor-
poration, also known as Amtrak, a cor-
poration organized under the Rail Pas-
senger Service Act of 1970, as amended,
and the laws of the District of Colum-
bia, and Weyman L. Moreland, Defend-
ants/Appellants.

No. CV–87–0061–PR.

Supreme Court of Arizona,
En Banc.

June 16, 1988.

Reconsideration Denied Sept. 20, 1988.

Fred J. Pain, Jr., Scottsdale, for plain-
tiff/appellee.

Evans, Kitchel & Jenckes, P.C. by Wil-
liam M.J. Shattuck, Phoenix, for defend-
ants/appellants.

MOELLER, Justice.

JURISDICTION

Stephen Ranburger (Ranburger) was fa-
tally injured when his car collided with a

train. His wife, Tana Ranburger (plaintiff), brought a wrongful death action against Southern Pacific Transportation Company, AMTRAK, the engineer, and the City of Phoenix on behalf of herself and her two minor children. The jury awarded the plaintiff $250,000 in compensatory damages against all defendants and $100,000 in punitive damages against all defendants except the City. The City did not appeal. The remaining defendants appealed both awards. The court of appeals affirmed the award of compensatory damages, and remanded for a new trial on punitive damages, 157 Ariz. 547, 760 P.2d 547. We granted review on the punitive damages issues and have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Rule 23, Arizona Rules of Civil Appellate Procedure, 17A A.R.S.

## ISSUES

We granted review to consider several interrelated issues raised by the opinion of the court of appeals:

1. Did the court of appeals correctly conclude that the evidence was sufficient to support an award of punitive damages?

2. If so, did the court of appeals err in remanding the punitive damages claim for retrial because the jury had been incorrectly instructed?

3. If remand was correct, should the new trial be limited to the issue of whether punitive damages should be awarded, or should the new trial also determine the amount of such punitive damages?

Our resolution of the first issue is dispositive of the case; therefore, we do not reach the second and third issues.

## FACTS

On December 21, 1980, at 12:28 a.m., Ranburger was killed when the car he was driving collided with a westbound Amtrak passenger train operated by Southern Pacific personnel. Ranburger was scheduled to report for work at 12:30 a.m. at the Garrett Turbine Engine Company, located just north of the crossing. Coming from the south on 36th Street in Phoenix, Ranburger had a good view of approaching westbound trains. The red flashing lights and the bells at the crossing were operating, as were the train's horn and headlights. There was no gate at the crossing, but standard warning signs were posted and the roadway was appropriately marked several feet from the crossing. Ranburger did not stop before attempting to cross the tracks, and one eyewitness said it looked as though Ranburger was trying to beat the train through the crossing.

The engineer and fireman who were operating the train both testified at trial. Neither saw Ranburger's car prior to impact. Both testified that the train was traveling between thirty-two and thirty-four miles per hour at the point of impact. However, the plaintiff's expert estimated the speed at slightly less than sixty miles per hour, the posted speed limit. Eyewitnesses' estimates of the train's speed varied from below forty to over fifty miles per hour. One witness testified that he had "never really noticed a train moving that fast before." [1]

Approximately 3,400 automobiles passed over this crossing daily. Auto traffic was especially heavy during Garrett's shift changes, such as the one at 12:30 a.m. Garrett workers testified that the warnings at this particular crossing came on well before the train actually arrived. Consequently, some cars crossed even after the warnings were activated. In fact, at least two other cars ignored the warnings and went through this crossing minutes before the Ranburger crash.

This case was tried before this court's landmark decisions in *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), and *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 723 P.2d 675 (1986). The trial court instructed the jury that it could award punitive damages if it found, by a

---

1. The train's speed tape was destroyed by Amtrak and was never analyzed. Amtrak claimed that its speed tapes were routinely destroyed three years after each trip. The jury was told of the tape's destruction.

preponderance of the evidence, that the defendants' conduct was "grossly negligent, reckless, willful or wanton." This instruction was then in common use. It is now recognized as improper both with respect to the standard of conduct and to the burden of proof. *See, e.g., Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 599 n. 3, 734 P.2d 76, 84 n. 3 (1987). The defendants contended on appeal both that the instruction was incorrect and that the evidence was insufficient to support the punitive damage award. The court of appeals held that the evidence was sufficient under the recently clarified standard of conduct. It remanded the punitive damages portion of the case for retrial with proper jury instructions.

## CURRENT STANDARD FOR PUNITIVE DAMAGES

■ It is now clear under Arizona law that punitive damages are appropriate only if the defendant acted with an "evil mind." This "evil mind" may be established where a defendant acts with the intent to injure or where his acts are motivated by spite or ill will. It may also be inferred when a defendant acts to serve his own interests, consciously disregarding a substantial risk of significant harm to others. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 422, 758 P.2d 1313, 1324 (1988).

To assist us in our analysis of the evidence, we turn to our decisions handed down since the "evil mind" standard was clarified. We affirmed the punitive damage award in *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 733 P.2d 1073, *cert. denied*, — U.S. —, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987). In that case the defendant insurance company, as a matter of company policy and over a long period of time, made deductions from claim payments for conditions which did not exist. For example, in handling a claim for the total loss of an automobile, it routinely deducted $35 for cleaning and $5 for tire wear, regardless of the car's actual condition. As an additional company policy, it instructed its agents to consistently make offers substantially below fair value, hoping the insured would not notice the relatively small bogus deduc-

tions from the total value and would be likely to take the offer in order to get the car fixed quickly. Noting the undisputed wrongfulness of the conduct, the duration of it, the fact that it was established company policy and its effect on innumerable claimants, this court affirmed the jury's punitive damage award. *Id.* at 498, 502, 733 P.2d at 1081, 1085.

We also affirmed the award of punitive damages in *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 758 P.2d 1313 (1988), where the insurance company consciously disregarded a substantial risk of significant harm to others by filing a lawsuit against a claimant which it knew was groundless. We have reversed several other awards of punitive damages because the evidence was insufficient under our new standard. *See, e.g., Volz v. Coleman Co.*, 155 Ariz. 567, 748 P.2d 1191 (1987); *Gurule v. Illinois Mut. Life & Cas. Co.*, 152 Ariz. 600, 734 P.2d 85 (1987); *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 734 P.2d 76 (1987).

Courts in other jurisdictions following standards similar to Arizona's have denied punitive damages where there was no evidence that railroad officials or employees had clear notice of an abnormal danger. For example, in *Anderson v. Chesapeake & Ohio Ry. Co.*, 147 Ill.App.3d 960, 101 Ill.Dec. 262, 498 N.E.2d 586 (1986), the court found no "conscious disregard" even though the railroad admittedly knew of several previous accidents at the same crossing, and experts testified that the crossing was extrahazardous. The court, distinguishing *Stromquist v. Burlington, infra*, 112 Ill.App.3d 37, 67 Ill.Dec. 629, 444 N.E.2d 1113 (1983), believed that there had to be something more, such as evidence that "defendant knew of and refused to remedy or repair *a specific dangerous condition*" which had caused the previous accidents, before a jury could infer even recklessness sufficient to find willful and wanton conduct. 147 Ill.App.3d at 965, 101 Ill.Dec. at 268, 498 N.E.2d at 592 (emphasis added). *See also Louisiana & North West R.R. Co. v. Willis*, 289 Ark. 410, 711 S.W. 2d 805 (1986) (evidence insufficient where

company plan to install signals at crossing failed due to financing problems and officials did not know crossing was abnormally dangerous).

Punitive damages have been allowed under a standard similar to Arizona's in Montana and Illinois. In these cases, the defendants had significant notice of a particularly dangerous condition and unjustifiably failed to rectify that condition. In *Runkle v. Burlington Northern*, 188 Mont. 286, 613 P.2d 982 (1980), the crossing was protected only by a stop sign and crossbucks. Members of the town council in which the crossing was located had written letters to various railroad officials urging them to slow the trains through the town and to install additional safety devices. There was also evidence that a railroad official had called a railroad employee who also served as a member of the town council, and said, "[Y]ou have worked for the railroad long enough to know better than to suggest reducing the speed of trains." *Id.* at 295, 613 P.2d at 991. Based on this evidence, the court believed a jury could properly award punitive damages. In the *Stromquist* case, 112 Ill.App.3d 37, 67 Ill. Dec. 629, 444 N.E.2d 1113 (1983), noted above, punitive damages were held appropriate where the railroad refused to correct a known dangerous condition at a crossing which had been the site of other fatal accidents unless the city agreed, in exchange, to close a different crossing.

## SUFFICIENCY OF THE EVIDENCE

With the benefit of these cases, we review the facts of this case. The plaintiff alleged that the crewmen "deliberately operated this train ... at excessive and unusually high speeds in an attempt to make up lots of lost time." The court of appeals, in concluding that the evidence was sufficient to support a finding of punitive damages, relied solely upon the element of speed. It reasoned:

> The engineer testified that a speed of 40 mph at the intersection in question would be a little bit foolish. He also stated that a speed of 50 mph would be a very foolish matter and gambling with

safety. He finally testified that travelling at 60 mph would be unthinkable. It is uncontroverted that the railroad set the speed limit for the train in the area of the intersection at 60 mph. A guard at one of the plants next to the tracks testified that the train went through the intersection faster than any other train he had seen. Also, appellee's expert established and testified that the train was travelling at a speed of 60 mph at the time of the collision.

We find that there was sufficient evidence to submit the question of punitive damages to the jury.

We review the facts in the light most favorable to sustaining the verdict. *Gurule v. Illinois Mut. Life & Cas. Co.*, 152 Ariz. 600, 603, 734 P.2d 85, 88 (1987). However, our review is governed by the principles that have now been enunciated in *Rawlings, Linthicum, Bradshaw, Gurule,* and other recent cases.

█ We are unable to agree with the court of appeals' analysis and conclusion. We note first that exceeding the speed limit is insufficient by itself to support punitive damages even under pre-*Linthicum* standards. *See, e.g., Southern Pac. Co. v. Baca*, 77 Ariz. 173, 268 P.2d 968 (1954). Plaintiff argues, through a mathematical calculation of elapsed time, that the train must have exceeded the posted speed limit somewhere along its route from Tucson to the accident scene. There is no serious contention, however, that the train was exceeding the posted speed limit of sixty miles per hour at the site of the accident. Nor is there evidence that the defendants set or kept the speed limit at sixty miles per hour with knowledge that such a speed limit had caused, or probably would cause, death or serious injury under the prevailing conditions; nor is there any evidence that speeding was encouraged or rewarded by the crew's superiors.

█ The plaintiff points to the engineer's testimony that it would be "foolish" or "unthinkable" to go through the Garrett crossing at fifty or sixty miles per hour. However, taken in context, this testimony is not as damaging as plaintiff asserts.

The evidence showed that the speed limit changed from sixty to thirty miles per hour several hundred feet west of the crossing. Thus, to retard the train's speed to thirty miles per hour before the lower speed limit took effect, a westbound train had to begin braking shortly before the Garrett crossing. The engineer testified:

Q. (By plaintiff's counsel): You see a sign [before the Garrett crossing] that says that you know means in two miles you have to be going 30 miles an hour.

A. Yes, sir.

Q. Right? And before that, you can do—you can be doing up to 60?

A. Yes, sir.

\* \* \* \* \* \*

Q. In this area, this immediate area [the Garrett crossing] is in an area that you can be doing as fast as 60 if you wanted to?

A. Yes, sir.

Q. But as the engineer, have you ever gone through this area, this 36th Street area that we are talking about, at 60 miles an hour?

A. No, sir, you couldn't get it stopped to—slowed to 30.

Q. Have you gone through this at 50 miles an hour?

A. You couldn't—it would be foolish. You couldn't hardly get it stopped at 30 miles an hour. And from 50 I'm not saying it's impossible but almost impossible.

Q. Why do you say it's foolish?

A. Well, you're gambling safety.

Plaintiff's counsel then asked the engineer whether he could wait until he was past the Garrett crossing and still comply with the upcoming thirty-mile-per-hour speed zone. The engineer replied, "No, sir. I wouldn't say I think I could do it in fifty and you would come to a complete stop. It would be a very foolish matter to do it. I believe the fireman would have already pulled the air if I tried that."

Counsel then again asked the engineer whether he had ever driven the train through the Garrett crossing at fifty or sixty miles an hour. The engineer respond-

ed negatively, explaining, "It would be a very foolish matter, very foolish. You would be gambling safety to think that you can get two-tenths of a mile up there, four-tenths of a mile, a quarter of a mile, well, it just—it's not necessary. It is just foolish." The context of the testimony makes it clear that the safety risk referred to by the engineer was the risk of slowing a moving train too abruptly and not the risk of speed at the Garrett crossing.

■ Although the court of appeals appears to have relied exclusively on evidence relating to speed, we must also consider plaintiff's contention that a jury could have found that defendants "actually saw this string of three cars and deliberately drove the train unabated towards this traffic at 60 miles per hour." The plaintiff bases this argument on evidence that two or three cars were near the crossing, one of which an eyewitness "pictured" getting hit. Because these cars were so close and because the engineer earlier testified that he had a good view of the tracks, plaintiff argues that the jury could have inferred that the train crew must have known these cars presented an emergency and consciously decided not to apply the brakes. *See, e.g., Southern Pac. Transp. Co. v. Lueck*, 111 Ariz. 560, 535 P.2d 599 (1975).

The record, however, does not support plaintiff's argument. Both the engineer and brakeman testified that they did not see Ranburger's car before impact. They did testify that they saw other cars, but that these cars were too far away to present a problem. This is corroborated by the same eyewitness who testified to "picturing" the accident:

Just before we pulled up, a pickup went by. And then after we pulled up, another white car drove by ... and I remember thinking, that train is getting close. It [the car] should have stopped and it drove by. And in my mind, I pictured that car getting hit by that train. And it just freaked me out. And I thought, oh, you know, sometimes I see things happening in my mind. And I just put it out of my mind.

And then *a couple of minutes later* I looked back down the track and saw the train coming up. And then as the engine got up even with the intersection, I saw Tana's husband pull up in the car. I saw the car coming. It did not stop.

(Emphasis added.)

It is clear from this testimony that the passing cars were separated by appreciable distances. Nothing supports plaintiff's suggestion that the train crew deliberately opted not to use the brakes in the face of a known danger.

█ Plaintiff also claims that the engineer, with over twenty years' experience, must have known that this was a particularly dangerous intersection. The engineer did testify that he knew cars often disregarded warnings in an effort to beat trains through crossings and that he often had to brake for cars doing so. But nothing in his testimony or in the record suggests that he had to brake often for cars at this crossing, or that he knew of any other particularly dangerous conditions under these circumstances. Unlike the cases mentioned above, the defendants did not consciously disregard a substantial risk. Our review of the entire transcript has failed to unearth evidence of an "evil mind" on the part of company officials or employees.

## CONCLUSION

We find the evidence insufficient to support a jury finding that the defendants intended to injure Ranburger, or that they were motivated by spite or ill will, or that they acted in conscious disregard of a substantial risk of significant harm to others. The judgment for punitive damages is therefore reversed. The portion of the court of appeals' opinion dealing with punitive damages is vacated.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.