Jacquline **SEYLER**, Plaintiff,

v.

**BURLINGTON NORTHERN SANTA FE CORPORATION,** Burlington Northern Santa Fe Railway Company, and National Railroad Passenger Corporation d/b/a Amtrak, Defendants.

**Civil Action No. 99–2342–KHV.**

United States District Court, D. Kansas.

May 31, 2000.

Daniel D. Owen, Shughart, Thomson & Kilroy, Overland Park, KS, P. John Brady, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, for Plaintiff.

Douglas R. Richmond, Michael L. Matula, Derek E. Feagans, Armstrong Teasdale LLP, Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Jacquline Seyler sustained injuries in a passenger train derailment near Kingman, Arizona. She filed suit against the National Railroad Passenger Corporation (Amtrak), which operated the train, and Burlington Northern Santa Fe Corporation and Burlington Northern Santa Fe Railway Company (BNSF),[1] which owns and maintains the railroad track and bridge on which the train was traveling at the time of the derailment. The matter is before the Court on *Defendant National Railroad Passenger Corporation's Motion For Summary Judgment* (Doc. # 80) and *Defendant BNSF's Motion For Partial Summary Judgment* (Doc. # 82), both filed March 1, 2000. For reasons set forth below, the Court sustains Amtrak's motion in part and sustains BNSF's motion in its entirety.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence

---

1. BNSF was formed in 1995 when the Santa Fe Railway merged with Burlington Northern.

presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## Discussion

### I. Amtrak's Motion For Summary Judgment

#### A. *Factual Background*

The Amtrak Southwest Chief passenger train runs between Los Angeles and Chicago. During the late evening of August 8 and the early morning of August 9, 1997, plaintiff was a passenger on the train. In the early morning of August 9, BNSF received warnings of heavy rains, thunderstorms, and flash floods in the area east of Kingman, Arizona. At approximately 1:48 a.m. Mountain Daylight Time ("MDT"), in response to the weather information, BNSF ordered track inspector Michael Putt to make an inspection of the track over which the Southwest Chief would pass upon leaving Kingman. Putt did an inspection which included an inspection of the track over the bridge at milepost ("MP") 504.1 ("bridge 504.1S").[2] Putt did not report any problems with the track or bridge, but he had no training in bridge inspection and did not consider himself to be a bridge inspector. Putt inspected the line (straightness), surface (shape and profile), and gage (distance between the two rails) of the track. He also looked for scour behind the bridge's dump planks and checked to see whether water appeared to

flow in a normal manner from one side of the bridge to the other.

When the train arrived in Kingman, Amtrak changed crews. After Putt had completed his inspection, at approximately 5:43 a.m. MDT, the Southwest Chief headed east from the Kingman station and traveled on the south track of BNSF double-track main line. Thirteen minutes later, at approximately 5:56 a.m. MDT, the train derailed at MP 504.1 because the bridge was structurally unsound and it had collapsed.

It was dark at the time of the derailment, and the train was operating with headlights. It had received clear signals (on the indicators next to the track) from the time it left Kingman until it derailed. At the time of the derailment, the Federal Railroad Administration classified the track from Kingman to bridge 504.1S as Class 5 track. By federal law, the maximum allowable operating speed for passenger trains on such track was 90 miles per hour ("m.p.h."). The BNSF timetable also permitted passenger trains to travel at 90 m.p.h. over this section of track.[3]

From the time the train left Kingman until it derailed, the engineer, Donald Hoskins, and the assistant engineer, Harry Miller, were constantly watching the track in front of and around the train and keeping an eye on the controls, including the speed. Hoskins was not aware of any unusually heavy rain, storms or high water between Kingman and bridge 504.1S. Up until a few seconds before the derailment,

---

**2.** The train station at Kingman is located at MP 516.4. Railroad mileposts on BNSF track divisions are in descending order from west to east.

**3.** Plaintiff alleges that BNSF had a posted speed restriction of 79 m.p.h. for this section of track. Plaintiff failed to authenticate the geometry car chart which shows the alleged speed restriction. *See* Exh. B to *Plaintiff's Response To Defendant National Railroad Passenger Corporation's Motion For Summary Judgment* (Doc. # 104) filed March 24, 2000. Even if the document would be admissible at trial, the Court cannot consider it unless plaintiff has properly authenticated it. *See*

*IBP, Inc. v. Mercantile Bank of Topeka,* 6 F.Supp.2d 1258, 1263–64 (D.Kan.1998); *see also Schartz v. Unified School Dist. No. 512,* 963 F.Supp. 1067, 1070 (D.Kan.1997) (party cannot attach document as exhibit "with no supporting affidavit, deposition testimony, or other relevant evidence authenticating the document"). Indeed, the pertinent record evidence establishes that the geometry car chart is erroneous. *See, e.g.,* Deposition of Donald Hoskins at 45, 47, 67. The Court therefore must exclude the chart because it lacks authentication and is unreliable. Accordingly, the Court excludes plaintiff's response to defendant's statement of fact 10 and plaintiff's additional fact 37 as it relates to speed.

neither Hoskins nor Miller saw any cause for alarm. At the time the train derailed, it was traveling between 88 and 90 m.p.h. Both Hoskins and Miller saw a little "hump" in the track as the train approached bridge 504.1S. Miller saw it first and immediately told Hoskins (who was looking down at his controls) to "plug it," *i.e.* apply the emergency brakes. Hoskins applied the brakes as soon as he possibly could. When Miller first saw the "hump," it was 200 to 300 feet in front of the train. A train traveling at 90 m.p.h. is traveling 135 feet per second, and this train was traveling too fast to stop before it derailed. Miller and Hoskins testified that even if they had seen the "hump" a second or two sooner, they would not had enough time to stop the train before it reached the bridge.[4]

BNSF owned, operated and maintained the track and bridge over which the Southwest Chief was traveling at the time of the derailment. BNSF is responsible for inspection and repair of its track and bridges. BNSF controls the operation and movement of trains over its track, but Amtrak engineers and conductors operate the Amtrak trains on BNSF track.

On August 9, BNSF dispatchers were in radio contact with the crew of the Southwest Chief, but they did not report any adverse or dangerous conditions of the track or bridges over which the train would travel. In the early morning of August 9, unnamed Amtrak employees knew of heavy rains and flash flooding in the area through which the Southwest Chief would pass. The crew of the Southwest Chief had no information, however, that any track or bridge was unfit for passage at timetable speed.

Dan Bodeman, BNSF Director of Dispatching Practices and Rules, testified that generally if BNSF knows about adverse or dangerous track or bridge conditions, its dispatcher will inform train crews and stop trains or require them to travel at reduced speed. Before the derailment, BNSF had no training program for employees who were required to do emergency high water bridge inspections.[5]

Hoskins testified that he operates his trains in accordance with the General Code of Operating Rules ("Operating Rules") which BNSF and other track operators have adopted. Section 6.21 of the Operating Rules provides:

[Railroad companies must] [p]rotect trains and engines against any known condition that may interfere with their safety. When conditions restrict visibility, regulate speed to ensure that crew members can observe and comply with signal indications.

In unusually heavy rain, storm, or high water, trains and engines must approach bridges, culverts, and other potentially hazardous points prepared to stop. If they cannot proceed safely, they must stop until it is safe to resume movement.

Hoskins testified that if he had known of any listed condition, Operating Rule 6.21

---

4. Plaintiff objects to this testimony by Miller and Hoskins as speculative and improper lay testimony. As an initial matter, however, plaintiff has failed to show that Miller and Hoskins should have seen the "hump" even a second earlier. Moreover, plaintiff has not offered evidence which suggests that an additional one or two seconds would have prevented the derailment. Plaintiff concedes that a train traveling at 90 m.p.h. is traveling 135 feet per second. Given the speed of the train and the obvious knowledge of engineers regarding the distance necessary to stop a train, the Court finds that the testimony of Miller and Hoskins is proper under Rule 701, Fed.R.Evid. Accordingly, plaintiff's objection is overruled.

5. Ray Duffany, one of plaintiff's experts, testified that BNSF should have immediately slowed train traffic when it received the flash flood warning, and that Putt should have stopped traffic and called for a trained inspector at bridge 504.1S. *See* plaintiff's statement of facts no. 36. BNSF objects to Duffany's statements because they are not relevant to the negligence of Amtrak and are conclusory. The Court agrees and will exclude plaintiff's statement of fact 36. *See Reazin v. Blue Cross & Blue Shield of Kan., Inc.,* 663 F.Supp. 1360, 1379 (D.Kan.1987), *aff'd,* 899 F.2d 951 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990).

would have required him to prepare to stop as he approached bridges in the area.[6] *See* Hoskins Depo. at 71.[7]

### B. *Analysis*

Amtrak seeks summary judgment on plaintiff's claims for compensatory and punitive damages. The parties agree that Arizona law applies because the derailment occurred in Arizona and plaintiff's injuries were sustained there. *See Hawley v. Beech Aircraft Corp.*, 625 F.2d 991, 993 (10th Cir.1980) (Kansas courts apply traditional rule of *lex loci delicti* to choice of law for tort claims); *Brown v. Kleen Kut Mfg. Co.*, 238 Kan. 642, 644, 714 P.2d 942, 944 (1986) (same). Plaintiff claims that Amtrak was negligent because (1) it did not request a bridge inspection by a qualified bridge inspector, (2) it did not ask the BNSF dispatchers about track and bridge conditions, (3) it did not abide by the BNSF posted speed restriction of 79 m.p.h., (4) it did not slow or stop the train in response to known flash floods, (5) train engineers did not keep a proper lookout, and (6) it did not inform its engineer about heavy rains and flash floods in the Kingman area.[8]

### 1. Amtrak's Failure To Request A Bridge Inspection And Failure To Ask About Track And Bridge Conditions

Plaintiff contends that Amtrak was negligent because it did not ask BNSF about the condition of the track and bridges or ask that a qualified bridge inspector check them. Amtrak responds that it did not have any right or duty to demand inspections of BNSF bridges or to insist that they be performed by certain qualified individuals.

Generally, the determination whether a duty exists is a question of law for the Court. *See Robertson v. Sixpence Inns of America, Inc.*, 163 Ariz. 539, 789 P.2d 1040, 1044 (Ariz.1990). Negligence cannot be based on defendant's failure to secure action by a third party over which it has no control. *See Mast v. Standard Oil Co. of California*, 140 Ariz. 19, 680 P.2d 155, 162 (Ariz.App.1983) (defendant railroad owed no duty to plaintiff because it did not have right to exercise day-to-day control over co-defendant's operations), *aff'd in part, vacated in part on other grounds*, 140 Ariz. 1, 680 P.2d 137 (Ariz. 1984) (en banc). Likewise, negligence requires knowledge of facts out of which a duty arises. *See Alires v. Southern Pac. Co.*, 93 Ariz. 97, 378 P.2d 913, 919 (Ariz. 1963) (en banc).

Here, Amtrak had no legal right to control or direct the operation of BNSF. BNSF owned, operated and maintained the track and bridges in question, and it controlled the operation and movement of trains over those tracks. Amtrak had no right to control BNSF track and bridge

---

6. Hoskins also testified that if he had been aware of any condition listed in Operating Rule 6.21, he would have called the BNSF dispatcher "to see what was going on," and "[s]ee if he put a track inspector out there and if he found out if everything was okay to go, or if we should be running at restricted speed or reduced speed or what have you." Hoskins explained that "[t]he dispatch is our communication with the track conditions and everything else," and that "[i]f he don't tell us, we don't know." Hoskins Depo. at 70–71.

7. Plaintiff states that immediately after the accident, BNSF adopted a policy which restricted train speed whenever a flash flood warning was received. Defendants seek to exclude this evidence under Rule 407, Fed. R.Evid. The Court agrees that the new BNSF policy constitutes a subsequent remedial measure and is inadmissible. Moreover, the policy is not relevant to plaintiff's claims against Amtrak. Accordingly, the Court will exclude plaintiff's additional fact 38.

8. Although plaintiff apparently abandoned her claims that Amtrak was negligent because it did not request a bridge inspection, ask about track and bridge conditions, and did not keep a proper lookout, *see Pretrial Order* (Doc. # 84) filed March 6, 2000 at 9, the Court nevertheless will address these claims because Amtrak briefed them shortly before entry of the pretrial order.

inspections, and no contractual duty to make its own inspections. It therefore owed plaintiff no duty to ensure that BNSF used qualified inspectors. Moreover, Ray Duffany, plaintiff's expert, points out that the critical failure was Putt's failure to call a qualified bridge inspector when he observed the conditions at bridge 504.1S. *See* Duffany Depo. at 82–86. Plaintiff has not shown that Amtrak had knowledge of conditions at bridge 504.1S. Without such knowledge, actual or implied by the opportunity to acquire such knowledge through the exercise of reasonable diligence, Amtrak had no duty to insist that BNSF dispatch a qualified bridge inspector to check the bridge.[9]

■ Plaintiff also claims that Amtrak was negligent in failing to ask BNSF about track and bridge conditions. Amtrak contends that it did not have a duty to do so. Amtrak correctly points out that BNSF knew about the condition of its track and bridges and was responsible for informing Amtrak of dangerous conditions. Accordingly, Amtrak had the right to rely on BNSF to inform it of dangerous or potentially dangerous conditions on BNSF track in BNSF territory. Plaintiff has not shown any facts which imposed on Amtrak an independent duty to learn about dangerous conditions on BNSF track and bridges.

■ Amtrak also argues that plaintiff cannot show that its failure to inquire about track conditions was the proximate cause of the accident. *See Robertson,* 789 P.2d at 1047 (proximate cause is essential element of negligence). BNSF not only failed to transmit information about dangerous track or bridge conditions, it also gave Amtrak clear signals from the time the train left Kingman until it derailed. BNSF did not issue a stop or slow order for the train. Plaintiff has not cited evidence that if Amtrak had inquired about track and bridge conditions, BNSF would

have delayed or stopped the train. Under these circumstances, plaintiff cannot show that Amtrak's failure to inquire was the proximate cause of the accident.

Plaintiff contends that a common carrier has a duty to its passengers to exercise the "highest degree of care," and that Amtrak therefore had a duty to request a bridge inspection and ask about track conditions. In dicta, the Arizona Supreme Court has noted that a railway carrier owes its passengers a duty to exercise "the highest degree of care practicable under the circumstances." *See Atchison, T. & S.F. Ry. Co. v. France,* 54 Ariz. 140, 94 P.2d 434, 436 (Ariz.1939); *Southern Pac. Co. v. Hogan,* 13 Ariz. 34, 108 P. 240, 241 (Ariz. Terr.1910). The Arizona Supreme Court has also stated that when a passenger is injured in a train derailment, the fact of the derailment creates a presumption of negligence on the part of the railroad which operates the train. *See id.* In *Hogan,* the court noted that the above rule is predicated on the theory that "when a railway car is thrown from the track, and a passenger is thereby injured, the presumption is that the accident resulted either from the fact that the track was out of order, or the train badly managed, or both combined, and the burden is on the company to show that it was not negligent in any respect." *Id.* It appears that in *Hogan,* defendant operated both the train and the track, and the court relied upon authorities in which plaintiff had sued the track owner and operator for negligence. *See, e.g., Denver, South Park and Pacific Ry. Co. v. Woodward,* 4 Colo. 1, 1877 WL 343 (1877) (defective switch in track); *Peoria, Pekin Jacksonville R.R. Co. v. Reynolds,* 88 Ill. 418, 1878 WL 9896 (1878) (defect in track); *Pittsburgh, Cincinnati & St. Louis R.R. Co. v. Williams,* 74 Ind. 462, 1881 WL 6456 (1881) (defendant owned both train and track).

---

9. The Court has analyzed whether Amtrak had a duty to request a bridge inspection. More precisely, the Court has determined as a matter of law that Amtrak's duty to its passen-

gers does not extend so far as to require it to ask BNSF and other track owners to send only certain individuals for track and bridge inspections.

The Court finds that the presumption of negligence discussed in *Hogan* is not applicable in this case. Most importantly, the owner and operator of the track (BNSF) is different from the operator of the train (Amtrak). Also, the cause of the derailment in this case is known and uncontested, *i.e.* the collapse of bridge 504.1S. In *Hogan,* other than the fact of the derailment and injury, plaintiff offered no proof of negligence or causation. *Id.* at 242. The railroad offered some evidence that it had exercised reasonable care, but it failed to explain specifically why the train derailed. *See id.* Here, plaintiff concedes that the collapse of bridge 504.1S caused the train to derail. BNSF, not Amtrak, owned and operated the track and bridge at issue. Accordingly, to the extent that any presumption is appropriate, it should be against BNSF—not Amtrak.

Nothing in *Hogan* or *Atchison* suggests that a train operator such as Amtrak must investigate and approve the track and bridge inspection procedures which a track operator uses. Arizona law does not suggest that Amtrak should be held to a higher standard of care because it is a common carrier. *See Block v. Meyer,* 144 Ariz. 230, 696 P.2d 1379, 1383 (Ariz.App.1985) (no reversible error in instruction that "common carrier merely owes a duty of reasonable care toward its passengers"); *Atchison,* 94 P.2d at 436 (reversing verdict based on jury instruction which stated that a carrier of passengers has a duty "to exercise the highest degree of care for the safety of its passengers which is practicable under the circumstances"). In *Block,* the court noted that "judicial statements about the high degree of care to be exercised by carriers 'should not be, as it has been and is sought here to be, taken as a pronouncement of a different, more exacting, standard of care required of carriers nor should such appellate judicial language be considered appropriate for use in instructing jurors.'" *Id.* at 1384 (quoting *Frederick v. City of Detroit,* 370 Mich. 425, 121 N.W.2d 918, 921 (Mich.1963)).

In sum, plaintiff has failed to present sufficient evidence that Amtrak had a duty to ask about track and bridge conditions or demand inspection of BNSF bridges by a qualified bridge inspector. Plaintiff has also failed to show that Amtrak's breach of any alleged duty to ask about track and bridge conditions was the proximate cause of the derailment. Accordingly, the Court sustains Amtrak's motion for summary judgment on these claims.

**2. Plaintiff's Negligence Claims Based On Speed**

Plaintiff claims that Amtrak failed to abide by the BNSF posted speed restriction of 79 m.p.h. and failed to slow or stop the Southwest Chief in response to known flash floods in the Kingman area. *See Pretrial Order* (Doc. # 84) filed March 6, 2000 at 9. Amtrak argues that both claims are preempted by the Federal Railroad Safety Act of 1994 ("FRSA"), 49 U.S.C. §§ 20101–21311. Congress enacted FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. FRSA authorizes the Secretary of Transportation "to prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a). FRSA contains an express preemption clause which provides:

Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106. The statute also has a savings clause which provides:

A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—

(1) is necessary to eliminate or reduce an essentially local safety hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

*Id.*

When a statute contains an express preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The FRSA preempts the legal duties which state common law imposes on railroads. *See id.* The Supreme Court has stated, however, that congressional use of the word "covering," in § 20106, indicates that "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.*

In *Easterwood,* the Supreme Court noted that the Secretary of Transportation set maximum allowable operating speeds for all trains for each class of track and that federal regulation substantially subsumed the subject matter of the relevant state law. *See id.* at 673–75, 113 S.Ct. 1732 (citing 49 C.F.R. § 213.9(a) (1992)). Accordingly, the Supreme Court held that a claim that defendant's train was traveling at an excessive speed, given the time and place, was preempted. *See id.* at 675, 113 S.Ct. 1732. The Supreme Court reasoned that the Secretary of Transportation set the speed limits only after taking into account the hazards posed by track conditions. *See id.* at 674, 113 S.Ct. 1732. It noted that "the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation based on common law speed restrictions." *Id.* The Supreme Court further stated that the FRSA savings clause did not save the

cause of action because the state law was not directed at "unique local conditions." *Id.* at 675, 113 S.Ct. 1732; *see id.* (state law was concerned with local hazards only in sense that its application turned on facts of case; common law of negligence provided general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions). Although the Supreme Court held that the FRSA preempted plaintiff's claim of excessive speed, it did not need to decide whether the FRSA also preempted plaintiff's claim for "breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." *Id.* at 675 n. 15, 113 S.Ct. 1732.

Plaintiff contends that Amtrak failed to obey the 79 m.p.h. speed limit which BNSF set for the section of track on which the derailment occurred. As an initial matter, however, plaintiff has failed to produce admissible evidence of the speed restriction. *See supra* note 3. Even if it were to consider the geometry car chart which shows the alleged speed restriction, the Court would reach the same result. Claims based on a railroad's failure to obey a self-imposed speed limit are preempted by FRSA. *See St. Louis Southwestern Ry. Co. v. Pierce,* 68 F.3d 276, 278 (8th Cir.1995); *see also Bowman v. Norfolk Southern Ry. Co.,* 832 F.Supp. 1014, 1017 (D.S.C.1993) (evidence of railroad's internal policies regarding train speed irrelevant), *aff'd,* 66 F.3d 315 (4th Cir.1995). Moreover, plaintiff has not shown that BNSF informed Amtrak of any speed restriction. For these reasons, the Court sustains Amtrak's motion for summary judgment on plaintiff's claim that Amtrak failed to obey the BNSF 79 m.p.h. speed limit.[10]

Plaintiff also claims that due to existing weather conditions, Amtrak had a

---

**10.** Here, the Southwest Chief was a passenger train, traveling on Class 5 track. Federal regulations permitted the train to operate at 90 m.p.h. At the time of the derailment, the train was traveling 90 m.p.h. or less. Based

on the *Easterwood* holding, any claim by plaintiff that Amtrak failed to operate the train at a reasonable speed is preempted by federal law.

duty to slow or stop the Southwest Chief. Amtrak argues that the FRSA regulation regarding speed, 49 C.F.R. § 213.9(a), preempts this claim. To prevail on its argument, Amtrak must establish that the FRSA regulation substantially subsumes the subject matter of the relevant state law. *See Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732. Nearly every court which has addressed this issue has held that a state law claim based on failure to slow or stop a train under certain circumstances is preempted. *See Cox v. Norfolk and Western Ry. Co.,* 998 F.Supp. 679, 687 (S.D.W.Va.1998) (snow covered crossing); *O'Bannon v. Union Pac. R.R. Co.,* 960 F.Supp. 1411 (W.D.Mo.1997) (inadequate warning devices, grade/angle of crossing, proximity to highway), *aff'd,* 169 F.3d 1088 (8th Cir.1999); *Herriman v. Conrail Inc.,* 883 F.Supp. 303, 307 (N.D.Ind.1995) (inadequate lighting at crossing); *Wright v. Illinois Cent. R.R. Co.,* 868 F.Supp. 183, 187 (S.D.Miss.1994) (vegetation, grade/angle of crossing, inadequate warnings); *Williams v. Alabama Great Southern R. Co.,* 1994 WL 419863, at *2 (E.D.La.1994) (presence of fog and brick facility); *Earwood v. Norfolk Southern Ry. Co.,* 845 F.Supp. 880, 888 (N.D.Ga.1993) (congested intersection, impaired visibility); *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.,* 844 F.Supp. 1152 (W.D.Tex.1994) (high traffic area without automatic gate and flashing light signals); *Bowman v. Norfolk Southern Ry. Co.,* 832 F.Supp. 1014 (D.S.C.1993) (same), *aff'd,* 66 F.3d 315 (4th Cir.1995); *but cf. Stone v. CSX Transp., Inc.,* 37 F.Supp.2d 789, 795–96 (S.D.W.Va.1999) (repeated signal apparatus malfunctions at particular crossing constituted local hazard); *Bakhuyzen v. National Rail Passenger Corp.,* 20 F.Supp.2d 1113, 1117–18 (W.D.Mich.1996) (poor visibility due to snow constituted specific individual hazard). The Court finds that 49 C.F.R. § 213.9(a), which prescribes operating speed limits for trains, substantially subsumes a common law claim that Amtrak was negligent in failing to slow or stop the train because of flash flood warnings.

Plaintiff argues that her claim is not preempted because the known flash floods in the Kingman area constitute a "specific, individual hazard" within the meaning of footnote 15 of *Easterwood.* In *O'Bannon, supra,* the district court explained the meaning of the exception for specific, individual hazards:

They must be aberrations which the Secretary could not have practically considered when determining train speed limits under the FRSA. More precisely phrased, the "local hazard" cannot be statewide in character and cannot be capable of being adequately encompassed within uniform, national standards. An alternative, expansive construction of the local safety hazard language would excessively preserve local speed regulations and significantly undermine the Secretary's ability to prescribe uniform operational speeds.

*Id.* at 1420–21. Generally, courts which have considered this issue have ruled that a "specific individual hazard" must be a discrete and truly local hazard such as a child standing on the railway, *O'Bannon,* 960 F.Supp. at 1420 & n. 10; *Bashir v. National R.R. Passenger Corp. (Amtrak),* 929 F.Supp. 404, 412 (S.D.Fla.1996); *see Cox,* 998 F.Supp. at 685 (adopting definition of *O'Bannon* court); *Herriman,* 883 F.Supp. at 307 (specific individual hazard includes engineer who sees motorist stranded on crossing, but nevertheless negligently fails to stop or slow train); *see also Williams v. Alabama Great Southern R. Co.,* No. 93–2117, 1994 WL 419863, at *2 (E.D.La. Aug.8, 1994) (the specific, individual hazard language in *Easterwood* "means what it says—namely, if possible, a train should reduce its speed in order to avoid an imminent collision").

Several courts have rejected claims that adverse weather conditions generally may constitute specific, individual hazards. *See Cox,* 998 F.Supp. at 685 (snow covered tracks are not specific, individual hazard; such condition is not discrete and truly local to certain locality of West Virginia);

*Stuckey v. Illinois Central R. Co.*, 1998 WL 97270, at *5 (N.D.Miss. Feb.10, 1998) (icy conditions which were not limited to subject crossing, but were prevalent throughout area, not specific individualized hazards contemplated by Supreme Court in *Easterwood*); *but cf. Bakhuyzen*, 20 F.Supp.2d at 1117–18 (poor visibility due to snow limited to localized area). In *Cox*, the district court reasoned:

> [snowy weather] is not an aberration which the Secretary could not have practically considered when determining train speed limits under the FRSA, and weather conditions such as these are capable of being adequately encompassed within uniform, national standards.... To hold that these conditions are not preempted by the FRSA would mean that every time it was not a perfectly sunny day and a train accident occurred, a plaintiff could bring a state suit based on train speed. Such a result would swallow the federal regulations dealing with train speed, undermine the Secretary's ability to prescribe uniform operational speeds, and act contrary to Congress' intent that laws, regulations, and orders related to railroad safety be nationally uniform to the extent practicable.

*Id.* at 685, 687.

Based on *Easterwood*, the Court finds that heavy rainfall, combined with a weather service flash flooding warning,[11] is not a "specific, individual hazard" within the meaning of footnote 15 of *Easterwood*. Heavy rains occur frequently all across the country. The weather service warning in this particular case covered the area from Truxton to Harris, Arizona, which involved approximately 44 miles of track. No specific, individual hazard existed at bridge 504.1S; rather, bridge 504.1S was within a large area of heavy rain. Inclement weather can be taken into account by the

Secretary of Transportation when prescribing uniform national standards. *See, e.g., Cox*, 998 F.Supp. at 687; *Stuckey*, 1998 WL 97270, at *5.

In support of her claim that adverse weather conditions may constitute a specific, individual hazard, plaintiff cites *Bakhuyzen, supra*. There, the court held that the FRSA does not preempt a state common law duty to slow a train due to snowy weather conditions. *Id.* at 1117–18. "Maximum train speeds, like automobile speed limits, do not remove from the driver the obligation to exercise due care when and if the circumstances such as poor visibility due to snow make operation at the maximum speed careless." *Id.* at 1118. The *Bakhuyzen* court reasoned that weather conditions are not capable of being adequately encompassed within uniform national standards because they are not static, they "arise and abate, requiring independent responses from individual engineers." *Id.*

This Court finds that the reasoning of *Bakhuyzen* does not apply to the instant action. First, in contrast to the present case, plaintiff in *Bakhuyzen* argued that the train had to operate at a slower speed because of "limited visibility due to snowy weather conditions" and an engineer's admission that the particular crossing was dangerous. Here, plaintiff has not presented evidence of impaired visibility or knowledge by Amtrak that bridge 504.1S had been undermined. Moreover, the Court agrees with the reasoning of *Cox* that weather conditions generally are capable of being adequately encompassed within uniform national standards. *See Cox*. 998 F.Supp. at 685.

Even if the flash flood warnings constituted a "specific individual hazard," the Court finds that plaintiff's claim

11. Plaintiff states several times that Amtrak knew about dangerous conditions *at bridge 504.1S*. The only evidence which plaintiff cites, and which the Court can find, is Amtrak's admission that unnamed employees knew within several hours of the derailment that the area through which the Southwest Chief would pass had experienced heavy rains and flash flooding. Based on such limited evidence, no reasonable jury could find that Amtrak specifically knew about dangerous conditions at bridge 504.1S.

**1238**

is preempted because it does not satisfy the requirements of the FRSA savings clause. In order for a state law to be saved, it "must be (1) necessary to eliminate or reduce an essentially local safety hazard; (2) not incompatible with a law, regulation, or order from the United States Government; and (3) not unreasonably burden interstate commerce." *Cox,* 998 F.Supp. at 687. The FRSA savings clause is to be narrowly construed. *See Easterwood v. CSX Transp., Inc.,* 933 F.2d 1548, 1553 n. 3 (11th Cir.1991), *aff'd,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *Cox,* 998 F.Supp. at 687; *Wright,* 868 F.Supp. at 187; *Bowman,* 832 F.Supp. at 1018. For the same reasons the Court found that no specific individual hazard existed at bridge 504.1S, it also finds that no "local safety hazard" existed at the bridge. Additionally, plaintiff's cause of action would be incompatible with the Secretary of Transportation's regulation regarding train speed and would unreasonably burden interstate commerce. *See Cox,* 998 F.Supp. at 688.

In sum, plaintiff's claim that Amtrak failed to obey the alleged 79 m.p.h. speed limit is both unsupported by admissible evidence and preempted by FRSA. The Court also rejects plaintiff's argument that flash flood warnings are a "specific, individual hazard" within the meaning of footnote 15 of *Easterwood.* Even if flash flood warnings could constitute a "specific, individual hazard," plaintiff's claim is preempted by FRSA and is not saved by the statutory savings clause.

**3. Amtrak's Alleged Failure To Keep A Proper Lookout**

In her complaint, plaintiff alleges that Amtrak was negligent in failing to keep a proper lookout for dangerous track and bridge conditions. Amtrak first argues that plaintiff has not presented evidence which would allow a reasonable jury to find that it breached such a duty. The Court agrees. Plaintiff's evidence on this point is woefully inadequate. Plaintiff concedes that the Amtrak engineers were constantly watching the track and surrounding area, and keeping an eye on the controls, from the time the train left Kingman until it derailed. As soon as Miller observed the "hump" in the track, he yelled for Hoskins to "plug it." Hoskins applied the emergency brakes as soon as he possibly could. Plaintiff concedes that the crew did not have enough time to avoid the "hump" and the resulting derailment. In response to defendant's argument, plaintiff has offered only her expert's conclusion that the crew failed to keep a proper lookout. *See* plaintiff's additional statement of fact no. 37. Plaintiff's expert bases his conclusion on the fact that Hoskins was looking down at his controls when Miller observed the "hump" in the tracks. Plaintiff's expert does not contend that the crew should have more promptly seen the "hump," however, and he does not explain the basis for his opinion that the crew was negligent. Accordingly, plaintiff cannot show that the Amtrak crew breached its duty to keep a proper lookout.

Even if plaintiff could show that Amtrak failed to keep a proper lookout, she has not presented evidence of causation. *See Robertson,* 789 P.2d at 1047 (proximate cause is essential element of negligence). Plaintiff has not shown that if the crew had seen the "hump" earlier or that if Hoskins had observed the "hump" when Miller did, they could have stopped the train before it derailed. In fact, both engineers testified that even if they had seen the "hump" a second or two sooner, they could not have avoided the derailment. Accordingly, plaintiff has failed to show any evidence of a causal connection between the derailment and the alleged failure to keep a proper lookout. *See Bryan v. Norfolk and Western Ry.,* 154 F.3d 899, 902 (8th Cir. 1998) ("even if [plaintiff] could show that the crew was not looking, she has not created a question of fact demonstrating that such a failure caused the accident").

The Court sustains Amtrak's motion for summary judgment on plaintiff's claim that Amtrak failed to keep a proper lookout.

### 4. Amtrak's Failure To Inform Hoskins Of Heavy Rains And Flash Flooding

After carefully reviewing the parties' briefing and the pretrial order, the Court finds one remaining claim of negligence based on Amtrak's failure to inform Hoskins of the heavy rains and flash flooding in the Kingman area. *See Pretrial Order* (Doc. # 84) filed March 6, 2000 at 9. Hoskins testified that if he had known of any condition listed in Operating Rule 6.21, which includes "unusually heavy rain, storm, or high water," he would have been required to prepare to stop as he approached bridges in the area. Because Amtrak has not specifically sought summary judgment on plaintiff's claim that Amtrak breached a duty to inform its own engineers of known adverse weather conditions, and neither party has briefed the issue, the Court must allow that claim of negligence to go forward.[12]

### 5. Plaintiff's Claim For Punitive Damages

■■■■■ To recover punitive damages under Arizona law, plaintiff has the burden of proving by clear and convincing evidence, either direct or circumstantial, that "defendant's evil hand was guided by an evil mind." *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 578 (Ariz.1986) (en banc). The required state of mind may be shown by evidence that (1) defendant acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others or (2) defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. *See Bradshaw v. State Farm Mut. Auto. Ins. Co.,* 157 Ariz. 411, 758 P.2d 1313, 1324 (Ariz.1988); *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 733 P.2d 1073, 1080 (Ariz.), *cert. denied,* 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987); *see also Linthicum v.*

*Nationwide Life Ins. Co.,* 150 Ariz. 326, 723 P.2d 675, 679 (Ariz.1986) (evil mind requires "conscious action of a reprehensible character;" key is intent to injure plaintiff or deliberate interference with rights of others, consciously disregarding unjustifiably substantial risk of significant harm). Clear and convincing evidence means evidence showing the truth of the contention is "highly probable." *Thompson v. Better–Bilt Aluminum Products Co.,* 171 Ariz. 550, 832 P.2d 203, 210 (Ariz. 1992) (en banc).

■■■■ Punitive damages cannot be based merely on evidence of defendant's gross negligence or reckless disregard of the circumstances. *See Volz v. Coleman Co., Inc.,* 155 Ariz. 567, 748 P.2d 1191, 1194 (Ariz.1987) (en banc); *see also Gurule v. Illinois Mut. Life and Cas. Co.,* 152 Ariz. 600, 734 P.2d 85, 88 (Ariz.1987) (en banc) (standard requires more than "reckless indifference"); *Linthicum,* 723 P.2d at 679 (something more than mere tortious conduct is required). "While the necessary 'evil mind' may be inferred, it is still this 'evil mind' in addition to outwardly aggravated, outrageous, malicious, or fraudulent conduct which is required for punitive damages." *Id.* at 679–80. In determining whether defendant acted with an "evil mind," courts evaluate "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred[,] . . . [t]he duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm, and any concealment of it." *Thompson,* 832 P.2d at 209 (quoting *Hawkins,* 733 P.2d at 1080).

■■■■ Plaintiff has not presented clear and convincing evidence that Amtrak deliberately withheld weather information from Hoskins or that it knew that withholding such information would create a substantial risk of significant harm to Amtrak passengers. The only record evi-

---

12. The Court recognizes that this claim of negligence is interrelated to several of plaintiff's other claims discussed above, but plaintiff also specifically pled the claim as a separate theory of negligence. *See Pretrial Order* (Doc. # 84) filed March 6, 2000 at 9.

dence establishes that unnamed Amtrak employees knew of heavy rains in the area but did not so inform Hoskins. No evidence suggests that Amtrak employees knew of any risk of harm from the heavy rains or that they intentionally concealed weather information from engineers of the Southwest Chief. At most, plaintiff has shown that Amtrak employees were negligent. As explained above, however, Arizona law requires more than reckless indifference or gross negligence to support an award of punitive damages. *See Gurule,* 734 P.2d at 88; *Volz,* 748 P.2d at 1194. Accordingly, the Court sustains Amtrak's motion for summary judgment on plaintiff's claim for punitive damages. *See Ranburger v. Southern Pacific Transp. Co.,* 157 Ariz. 551, 760 P.2d 551, 554 (Ariz. 1988) (en banc) (train crew's deliberate attempt to "make up lots of lost time" by operating train at excessive and unusually high speeds could not support punitive damages award).

In sum, the Court overrules Amtrak's motion for summary judgment on plaintiff's claim that Amtrak was negligent because it did not inform its engineers of heavy rains. Amtrak's motion is sustained on plaintiff's other claims of negligence and on plaintiff's claim for punitive damages.

## II. BNSF's Motion For Partial Summary Judgment

### A. *Factual Background*

For purposes of the BNSF motion for partial summary judgment, the following facts are uncontroverted, deemed admitted or where disputed, viewed in the light most favorable to plaintiff.

During the late evening of August 8 and the early morning of August 9, 1997, plaintiff was a passenger on the Amtrak Southwest Chief train traveling, from Los Angeles, California to Lawrence, Kansas. Frank Greaves was on duty as a BNSF dispatcher when he received warnings of

heavy rains, thunderstorms, and flash floods in the area east of Kingman, Arizona. At approximately 1:48 a.m. MDT, in response to the weather information, BNSF delayed the Southwest Chief so that track supervisor Michael Putt could make a special inspection of the track east of Kingman, which included MP 504.1. Putt had no training in bridge inspection and did not consider himself a bridge inspector.

BNSF owns two railroad bridges which are located side by side at MP 504.1 near Kingman, one that carries westbound traffic (the "north track" or "504.1N") and one that carries eastbound traffic (the "south track" or "504.1S"). Less than two hours before the accident, Putt stopped at bridge 504.1S, but did not see any problem; he believed that the bridge was safe for travel by passenger trains. Putt did not exit his vehicle to look underneath the bridge, and he did not know that he was inspecting a shallow foundation "mud sill" bridge which had no deep pilings supporting it. Putt inspected the line, surface, and gage of the track, looked for scour behind the bridge's dump planks, looked for scour upstream of the bridge, and checked to see if water appeared to be flowing in a normal manner from one side of the bridge to the other.

Before the Southwest Chief arrived in Kingman, Craig Newton replaced Greaves at the dispatch post. Greaves told Newton of the flash flood warning. When Greaves left his shift, he had not informed the Southwest Chief of the flash flood warning because the train had not yet entered the area of the warning. Greaves expected Newton to tell the train crew about the potential flooding and Newton had a duty to do so under the dispatcher manual. Greaves and Newton knew that flash flooding could cause a danger to trains. BNSF policies require that in unusually heavy rain, storm or high water, trains and engines must approach bridges, culverts and other potentially hazardous points prepared to stop.[13] At approximately 5:41

---

13. At the time of the derailment, BNSF received a financial incentive from Amtrak if Amtrak trains ran on time and were not delayed. Greaves had previously been disciplined for causing the loss of such an incen-

a.m. MDT (15 minutes before the accident), a westbound train passed over bridge 504.1N. Its lead locomotive engineer looked at bridge 504.1S but did not notice anything irregular about it. At approximately 5:43 a.m. MDT, BNSF released the Southwest Chief from Kingman. Although Newton knew of the flash flood warning, he did not inform the Southwest Chief because BNSF policy did not require him to do so and, because Putt was patrolling the track and reported no unsafe condition, he thought that a hazard did not exist.

As the Southwest Chief approached bridge 504.1S, Hoskins and Miller saw a "hump" in the tracks at the bridge, but could not stop the train before it derailed. The flash flood warning for the area expired five minutes after the train derailed. Post accident investigation revealed that several feet of the soil under bridge 504.1S had eroded, thereby leaving its foundation without support. In his 35 years of experience, Jerry Walters, the BNSF Bridge Supervisor for the Arizona territory, had never seen anything like the depth and magnitude of the erosion at bridge 504.1S.

### History Of Bridge 504.1S And Its Cross Wall

Bridge 504.1N was built in 1907 and rebuilt in 1940, both times on a deep foundation of wooden piles driven into the earth. Bridge 504.1S was built in 1922 on wooden blocks laid on the surface of the stream bed with no driven piling beneath them. As it existed before the accident, bridge 504.1S was a shallow foundation "mud sill" bridge, which means that its foundations were not driven into the earth but instead sat on timber sills and blocks. 504.1N survived the flash flood of August 9, 1997 but 504.1S collapsed.

In the 75 years before the Kingman accident, bridge 504.1S had never failed or washed out. BNSF made several repairs to the bridge. In 1954, inspectors noted "pumping" of the piers (bouncing up and down) and swinging of the rails, which indicated an unstable foundation. In 1955, BNSF placed stone "rip rap" (large rocks) in the stream bed to prevent undermining

---

tive. BNSF seeks to exclude evidence of both the previous disciplinary action against Greaves and the financial incentives between BNSF and Amtrak. *See Defendants' Motion In Limine* (Doc. 92–9, 92–10) filed March 14, 2000.

The disciplinary action against Greaves is of marginal relevance because Newton had relieved Greaves before the Southwest Chief entered the area covered by the flash flood warning and no evidence suggests that Newton feared disciplinary action if he delayed the train. Greaves also testified that he was unaware of any prior disciplinary action and that BNSF simply put a note in his personnel file. Accordingly, the Court sustains defendants' motion in limine regarding the prior disciplinary action against Greaves.

The evidence of the financial incentive for on time performance is relevant only to the issue of punitive damages. Plaintiff has not offered evidence regarding what conditions must be satisfied for the incentive or the amount of the incentive. Based on the financial incentives, the BNSF dispatcher manual provides that dispatchers shall not delay passenger trains unless authorized by a supervisor. According to Greaves, this provision did not apply to delays caused by adverse weather conditions. *See also* Affidavit of R.D. Simonen ¶¶ 4–8, attached to *Defendants' Reply memorandum In Support Of Their Motions In Limine* (Doc. # 113) filed April 14, 2000. Greaves also testified that to the extent any financial incentive might have applied to the Southwest Chief on August 9, BNSF had already lost its incentive because of the train's delay for heavy rains and Putt's inspection. *See id.* ¶ 6. Therefore BNSF had foregone any financial incentive (to the extent it applied in the weather conditions) so that Putt could inspect the tracks. Such evidence is relevant to whether BNSF had an "evil mind" when it failed to inform the crew of the Southwest Chief of heavy rains in the area. The Court finds that with respect to plaintiff's claims for compensatory damages, however, the probative value of the financial incentives evidence is substantially outweighed by the danger of unfair prejudice to BNSF, confusion of the issues, and misleading the jury under Rule 403, Fed.R.Evid. Accordingly, the Court sustains defendants' motion in limine with respect to financial incentives between BNSF and Amtrak. The Court will consider such evidence for purposes of the instant motion but the parties cannot present such evidence at trial on plaintiff's claims for compensatory damages.

of the bridge foundation. Rip rap helps to keep soil in place during water flow instead of washing down stream. In 1957, inspectors again observed pumping of the piers and swinging of the rails. In 1959, BNSF placed more rip rap in the stream bed and paved part of the stream bed to control undermining. In 1964, BNSF placed concrete grout in the stream bed to control undermining.[14]

In 1975, because of the incidents of erosion and scouring of the mudlocks, BNSF considered replacing bridge 504.1S in the 1977 capital improvement program.[15] A BNSF employee in the Division Office in Winslow, Arizona, recommended that the railroad install a cross wall down stream from the bridge to prevent further erosion and thereby protect the bridge foundations. In December 1975, BNSF placed a cross wall down stream from bridge 504.1S. The purpose of the cross wall was to prevent erosion by holding dirt in place under the bridge, thereby maintaining the level of the stream bed around the foundations. The cross wall was not designed by a competent designer, however, and no calculation or engineering was performed to determine whether the cross wall was adequate. The cross wall technique has been criticized by expert witnesses for BNSF, who testified that it was an ineffective measure for protecting the bridge foundations. In June 1976, BNSF added grouted rip rap around the sills because due to the lack of rain, the erosion which existed when the cross wall was installed had not yet been filled in.

Jack King was the BNSF bridge engineer for Arizona when the cross wall was placed, and he was responsible for maintaining bridges in Arizona. BNSF installed the cross wall, however, before consulting with King. When King first learned that the Division office was proposing a cross wall, he did not believe that it was the approach to take because a recent drainage survey indicated that the bridge was undersized—the opening beneath the bridge was perceived to be too small to convey the water that would be expected to pass under it during heavy rain. In a letter to King dated January 13, 1976, Art McGinnis, one of King's assistants, reported that the capacity of the bridge was 480 cubic feet per second and that the Division office proposed a down stream cross wall. King wrote on the bottom of the letter "I don't think this is the approach to take." King wanted to verify whether the drainage study was accurate because he was not aware of any history of high water incidents at the bridge, which he would have suspected if the bridge was in fact undersized. King asked his assistant, Art McGinnis, to do field work to confirm the accuracy of the drainage study.[16] By May 1976, King agreed to the cross wall and decided that the bridge did not need to be replaced because the cross wall was an

---

**14.** Plaintiff's expert Gene Corley testified that the placement of grouted rip rap in the stream bed is not a suitable measure to protect the bridge piers against local scour of the flowing water.

**15.** Sometime in 1975 or 1976, bridge supervisor Jerry Walters also recommended that the bridge be replaced. Walters stated in the bridge inspection record to "place on five-year" renewal list.

**16.** Plaintiff has attempted to introduce certain documentation allegedly related to the calculations made by McGinnis and King. *See* attachments N and O to *Plaintiff's Response [To] Defendant Burlington Northern Santa Fe's Motion For Partial Summary Judgment* (Doc. # 105) filed March 24, 2000. The Court must

exclude the documents because plaintiff has failed to authenticate them. *See IBP,* 6 F.Supp.2d at 1263–64; *see also Schartz,* 963 F.Supp. at 1070 (party cannot attach document as exhibit "with no supporting affidavit, deposition testimony, or other relevant evidence authenticating the document"). Even if the Court did not exclude the documents, plaintiff has failed to controvert the fact that in May 1976, King ultimately agreed to the cross wall and thought that it would protect the bridge.

The Court also excludes plaintiff's allegation that Putt testified that water was running into the bridge from multiple directions because she failed to attached the cited testimony to her opposition brief and the cited pages are not in any of the excerpts submitted by the parties.

appropriate, safe measure that would protect the bridge foundations from the erosion that had originally caused BNSF to consider replacing the bridge. Accordingly, BNSF removed the bridge from its 1977 budget list for replacement.[17] In his affidavit, King stated that if he had not believed that the cross wall would protect the bridge foundations during heavy rain, he would have made sure that BNSF took additional protections. In 27 years of experience with railroad bridges, King was not aware of any incidents in which a cross wall had failed, causing a bridge to collapse during a storm. King was aware of the history of erosion and undermining at the bridge. At the time he agreed that the bridge did not need to be replaced because of the cross wall, King had no idea that the bridge or cross wall were in any danger of erosion approaching the bridge from down stream.

Several BNSF witnesses acknowledged that an undersized bridge which backs up water is more susceptible to undermining: the water is forced to flow faster and at higher pressure beneath the bridge, thereby scouring away more soil under the bridge.

### The "Headcut" That Caused The Bridge Failure

A "headcut" which originated down stream of bridge 504.1S, off of BNSF property, caused the bridge to fail on August 9, 1997. A headcut is a vertical or steeply sloping face of a stream bed which occurs at a break in slope at the channel profile. Headcuts move upstream.[18]

The ground which surrounds the bridges at MP 504.1 contains a layer of caliche, a soil which is more resistant to erosion than other soils. The caliche layer erodes naturally, but the rate of erosion was accelerated when BNSF built an embankment at bridge 504.1S which channeled water from a 19 square mile area through a 30 foot opening. During subsequent rains, the headcut, capped by the caliche layer, moved upstream, below the cross wall, removing the otherwise erosion resistant caliche layer from the stream bed as it went. During the storm of August 1997, the headcut moved upstream and through the stream bed below bridge 504.1S, thereby removing the support from under the bridge foundations, and causing the bridge to fail.

### BNSF Inspection Of Bridge 504.1S

From 1976 to 1999, Melvin George was the bridge inspector who performed routine bridge inspections in Arizona. At the time of the derailment, he performed two such inspections each year. From 1976 to 1999, George's supervisor was Jerry Walters, whose job as structures supervisor included an annual inspection in which he and George inspected bridges together. In addition to these inspections, BNSF annually sent a bridge (structures) engineer to Arizona to inspect bridges with Walters. The purpose of this inspection was to determine whether any bridge should be renewed or replaced and if so, to set priorities for budgetary purposes (the "budget bridge inspection"). Kenneth Dout, Walters' supervisor, typically accompanied Walters and the bridge engineer on bridge inspections in Arizona. Before the engineer traveled to Arizona, Walters would prepare a packet of materials for Dout and the engineer. The packet indicated which bridges, in Walters' opinion, should be considered for renewal or replacement. Sometimes while Walters, Dout and the engineer were inspecting these bridges, the group stopped at other nearby bridges.

During two such budget bridge inspections, in August 1995 and in April 1997, BNSF employees stopped at bridge

---

17. Sometime after BNSF installed the cross wall, bridge inspector Melvin George copied a notation out of the office inspection book into his field inspection book which read "renew budget [19]79 to match N.T. [north track]."

18. Water flows over (and thus undermines) the base of the face of the headcut. The headcut face will eventually fall, thereby causing the face to move upstream. Stream bed erosion by means of head cutting is a natural process in the vicinity of bridge 504.1S.

504.1S. Walters and Dout were present at both inspections. Byron Burns was the bridge engineer at the first inspection and Ronald Michelbook was the engineer at the second inspection. Walters had not listed bridge 504.1S on the materials he had prepared for the 1995 and 1997 inspections because he did not believe that the bridge needed repair or replacement. During both inspections, however, Walters, Dout and the engineer stopped at bridge 504.1S.[19] Burns and Michelbook did not believe that either the bridge or the cross wall were unsafe or that the bridge needed to be renewed or replaced. If they did, they would have noted their concerns and taken appropriate safety measures. Likewise, Dout stated that if he had noticed a potentially unsafe condition, he would have directed Walters to fix it and made sure that the bridge/structures engineer noted the condition. If the condition suggested that the bridge was in need of renewal or replacement, Dout would also have made sure that it was noted and put in a list to be prioritized. Dout stated that in the two inspections, he did not observe any condition that posed a danger to the structural integrity of bridge 504.1S or made it unsafe for trains, and he did not see anything which suggested that the bridge had recent scour problems. Dout stated that the cross wall appeared to be keeping the stream bed under the bridge from eroding.

On February 18, 1997, George and Walters conducted their annual inspection of bridge 504.1S, but did not believe that anything was wrong. George was at bridge 504.1S on July 9, 1997, but believed that the bridge was "okay" at the time. He did note in his inspection record: "watch S.T. [south track] for scour S.T. [south track] has frame bents on mud sills." George made this notation because the bridge he had previously inspected had been scoured down to the bottom of its mud blocks.[20]

On July 9, 1997, George inspected approximately 33 bridges. On the morning of the derailment, he was on vacation. George testified that no one filled in for him when he was on vacation, and that BNSF had never called him out to do an emergency high water bridge inspection. At the time of the derailment, neither George nor Walters believed that the bridge or cross wall faced any danger due to erosion caused by down stream sources.

## B. Additional Motions In Limine

**Subsequent Remedial Measures (Doc. # 92–16), Previous Bridge Collapses (Doc. # 92–14)**

■ Plaintiff argues that because BNSF track inspectors examined only the track line, gage and surface during emergency high water inspections, it failed to detect the imminent collapse of shallow foundation bridges in 1981, 1983 and 1990. See plaintiff's additional fact no. 53. In support of her contention, plaintiff relies on a script, and accompanying pictures, which Don Lozano prepared for BNSF internal scour awareness training after the Kingman accident. BNSF seeks to exclude such evidence under Rule 407 of the Federal Rules of Evidence as a subsequent remedial measure. See Defendants' Motions In Limine (Doc. # 92–16) filed March 14, 2000. Rule 407 provides:

> When, after an injury or harm allegedly caused by an event, measures are taken

19. In April 1997, Michelbook stopped at several bridges which Walters had not listed, but other than bridge 504.1S, he could not remember which ones he visited.

20. George did testify that during his inspection on July 9, he observed two and one half feet of scour on the down stream side of the cross wall. George explained that he did not specifically look for scour in that location during his inspections, however, and that he did not know how deep the cross wall was or that scour on the down stream side of a cross wall could be a dangerous condition.

Based on the fact that the cross wall was three feet tall, BNSF vice president Steve Milsap testified that it eventually would have fallen if earth was not replaced on the down stream side. In fact, a BNSF videotape from 1992 shows some drop in height on the down stream side of the cross wall.

that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence [or] culpable conduct.... This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Rule 407 is based on the theory that remedial measures are not in fact admissions but are equally consistent with injuries by mere accident. *See* 1972 Advisory Committee Note, Fed.R.Evid. 407. Exclusion of remedial measures also favors "a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." *Id.*

Plaintiff argues that although the fact of the training program is inadmissible, the training script—which contains historical facts regarding the three bridge collapses—can be presented without reference to the subsequent remedial measure. As an initial matter, however, the Court finds that presentation of the "historical facts" without reference to the training program is not practicable. If the Court were to carve out the "historical facts" without reference to the training program, the jury would not have the contextual information necessary to evaluate the probative value of the statements. *See* David P. Leonard, The New Wigmore: A Treatise On Evidence § 2.6.2 at 2:56–7 (Supp.2000). Lozano, who prepared the training script, testified that he did not have personal knowledge of the three incidents, that others had told him different stories of the incidents, and that for teaching effect he made up many of the "facts" in the training materials. Because the historical facts cannot be excised without effectively revealing the existence of the training program, the Court will exclude them. *See id.*

The policy behind Rule 407, *i.e.* to encourage people to take steps for added safety, is best promoted by exclusion of the statements. BNSF implemented the training program to avoid accidents similar to the one at bridge 504.1S. To emphasize the importance of the program to its employees, BNSF—at some cost—accumulated data regarding bridge collapses which arguably could be attributed to less than diligent inspections. If plaintiff were allowed to present such information as historical fact, defendants such as BNSF would be discouraged from preparing such information for their employees. Through discovery, plaintiff had the opportunity to obtain information regarding the three prior incidents from individuals who had firsthand knowledge of the relevant circumstances. Instead, plaintiff chose to rely on the incident description in the BNSF training program. Excluding the training materials under Rule 407 does not necessarily prevent plaintiff from presenting information regarding the three prior incidents; it simply requires plaintiff to obtain such information from other sources. For these reasons, defendants' motion in limine on subsequent remedial measures is sustained.[21]

BNSF also seeks to exclude evidence related to the three incidents based on the lack of similarity between the incidents and the collapse of bridge 504.1S, *see Defendants' Motions In Limine* (Doc. # 92–14) filed March 14, 2000. For prior accidents to be relevant, plaintiff must demonstrate that they are substantially similar to the accident at issue. *See Cox v. Kansas Gas & Elec. Co.*, 630 F.Supp. 95, 97 (D.Kan.1986). When evidence of prior accidents is offered to show that defendant had notice, however, the required showing of similarity is more relaxed. *See id.; Edwards v. Consolidated Rail Corp.*, 567 F.Supp. 1087, 1105 (D.D.C.1983). Here,

**21.** Plaintiff has not filed any opposition to defendants' motion in limine regarding the BNSF subsequent remedial measures of (1) rebuilding bridge 504.1S and surrounding bridges, (2) creating new speed restrictions in areas covered by flash flood warnings or (3) creating a list of scour susceptible bridges.

plaintiff has offered evidence of the following incidents:

1. In 1981 during heavy rains, a BNSF track inspector and roadmaster checked the line, gage and surface over bridge 562.8 in Arizona. They did not notice anything unusual and cleared the track for traffic. Because of an unrelated delay of an Amtrak train, the BNSF dispatcher allowed the track inspector to turn around and return on the track. At bridge 562.8, the track inspector discovered that the bridge which he had inspected 45 minutes earlier had collapsed into the water.

2. During heavy rains, in 1983, a BNSF track inspector checked the line and surface over bridge 691.2 in Arizona, and took no exception to the bridge. One mile further east, the track inspector discovered water over the track so BNSF took both of the main lines out of service. After the water receded around bridge 691.2, a second inspector found that a pier had sunk eight feet and was no longer supporting the bridge, which could have caused the bridge to collapse if a train had crossed over it.

3. In 1990, a spread footing foundation concrete pier scoured and settled approximately two inches during a storm. The track gang tamped up a low spot in the track at bridge 645.3 and shoveled some ballast to the spot. The track gang did not tell the bridge department about the repair. Later, the bridge inspector found a broken pier.

Plaintiff has not met her burden of showing that the above incidents are "substantially similar" to the accident near Kingman. First, plaintiff has not shown that bridges 562.8, 691.2 or 645.3 were shallow foundation bridges similar to bridge 504.1S, or that down stream conditions contributed to the problems at bridges 562.8, 691.2 and 645.3. Second, the three incidents, particularly the 1981

and 1983 incidents, are remote in time to the derailment at bridge 504.1S. Finally, with respect to the 1990 incident, plaintiff has not presented evidence that the bridge inspector discovered the broken pier before any trains crossed the bridge. Plaintiff's statement that the bridge was "dangerously unstable and ready to collapse if a train had crossed it" is completely unsupported by her citations to the record. Most importantly, the defect at bridge 645.3 went unnoticed because the track inspector did not call the bridge department, not because the track inspector did not make an adequate inspection. At bridge 645.3, the track inspector discovered the potential defect but erred by failing to inform the bridge inspector. For these reasons, the Court sustains defendants' motion in limine on previous bridge collapses.

### Number Of Bridge Inspectors (Doc. # 92–13)

Plaintiff points out that BNSF previously had three bridge inspectors for the Arizona territory; that George was the only bridge inspector in July 1997; and that at some point, Walters requested additional bridge inspectors because of his concern for the safety of the inspectors working in the middle of the desert without anyone nearby. BNSF argues that such evidence should be excluded because plaintiff has not shown a casual connection between the number of bridge inspectors and the train derailment. *See Defendants' Motions In Limine* (Doc. # 92–13) filed March 14, 2000. Plaintiff points out that George saw two and one half feet of scour on the down stream side of the cross wall during his last inspection before the derailment and failed to follow up on it. Plaintiff claims that being grossly overworked is a possible explanation for his failure to follow up. Plaintiff ignores the fact that although George observed scour on the down stream side of the cross wall, the danger of such a condition was not apparent to George. No one at BNSF had told him of the potential danger and George did not

specifically look for scour at the cross wall during his inspections. Based on the record evidence, no reasonable jury could find that even if they had more time to inspect the bridge, George or any bridge inspectors would have noticed anything wrong with bridge 504.1S. Plaintiff certainly can argue that George or another qualified inspector should have detected the headcut and/or appreciated the danger of scour on the down stream side of the cross wall. Plaintiff has not shown, however, that the number of BNSF inspectors is relevant to this inquiry. Accordingly, the Court sustains defendants' motion. The Court notes that if plaintiff can show that a qualified bridge inspector with adequate time to inspect the bridge would have recognized that scour at the cross wall was a potential problem, then evidence of the number of BNSF bridge inspectors in the territory might be relevant to plaintiff's claim for compensatory damages.

**Bridge Replacement Budget (Doc. # 92–8)**

Defendant seek to exclude evidence of the BNSF budget for bridge upkeep and replacement. *See Defendants' Motions In Limine* (Doc. # 92–8) filed March 14, 2000. Plaintiff argues that the BNSF budget was never sufficient to replace all bridges which its bridge inspectors recommended for replacement. Plaintiff, however, ignores the fact that bridge 504.1S has not been recommended for replacement at any time after 1979. Regardless of the bridge replacement budget, a bridge is not replaced unless a bridge inspector recommends it for replacement. Plaintiff has not shown that the BNSF budget influenced the recommendations of bridge inspectors. Evidence that other field engineers could not obtain funding to improve other bridges because of the BNSF budget is not probative of the negligence (or malice) of either defendant with respect to bridge 504.1S or the derailment of the Southwest Chief.

C. *Analysis*

BNSF only seeks summary judgment on plaintiff's claim for punitive damages. The parties agree that Arizona law applies because the derailment occurred in Arizona and plaintiff's injuries were sustained there. *See Hawley,* 625 F.2d at 993; *Brown,* 238 Kan. at 644, 714 P.2d at 944. The Court set forth above the standards for punitive damages under Arizona law. *See supra* text part I. B.5. Plaintiff's claim for punitive damages is based on evidence that (1) BNSF did not replace bridge 504.1S which had a known dangerous condition, (2) BNSF sent an untrained employee to inspect the bridge immediately prior to the derailment, and (3) BNSF did not inform the Amtrak train crew of the danger posed by flash flooding in the area. The Court will consider each of plaintiff's contentions separately and then in combination.

1. *BNSF Failure To Replace The Bridge*

■ Plaintiff contends that BNSF acted with an "evil mind" because in 1975 it chose to install a cross wall as a temporary solution for erosion problems instead of building a new bridge with deep pilings.

In the 1950s, 1960s and 1970s, BNSF employees observed erosion of the stream bed under the bridge. BNSF made several attempts to remedy the problem and finally considered replacing the bridge with one on piles. Instead of replacing the bridge, however, BNSF decided to install a cross wall to keep the soil under the bridge from flowing down stream during water flow. After the cross wall was installed, bridge engineer King believed that it was an appropriate, safe way to correct the erosion problems. In May 1976, he agreed to remove the bridge from the replacement list. He had never heard of a bridge collapsing because a cross wall had failed.

George and Walters also thought that the cross wall had cured the previous erosion problems. During their inspections, George and Walters did not see any indication that the stream bed beneath the bridge was eroding or otherwise threaten-

ing the bridge's foundation. Inspection records do not suggest that BNSF had to take erosion control measures after July 1976, or it observed scour or erosion beneath the bridge near the sills. Moreover, inspection records by George and Walters mention no concerns about the cross wall or its condition. If the cross wall presented a danger, they apparently failed to recognize it. During their last annual inspection before the derailment, George and Walters did not believe that the bridge posed a danger. On July 9, 1997, only one month before the derailment, George made a routine inspection of the bridge and took no exception to its condition. He noted that it was "okay" and said "watch for scour." George made the notation regarding scour because he had observed signs of scour at a nearby bridge (506.9). No evidence suggests that BNSF thought the bridge and cross wall were potential hazards.

Plaintiff contends that after the cross wall was installed, BNSF repeatedly overruled bridge inspector recommendations to replace bridge 504.1S. In support, plaintiff cites two notes on inspector records: Walters's notation "place on 5-year" renewal list and George's "Renew Budget 79 to match N. T." notation. Walters made his notation in 1975 or 1976 and George made his notation sometime in the late 1970s. Walters and George cannot recall why they recommended bridge replacement. In any case, neither of them recommended replacement of the bridge in the next 20 years. In fact, Walters crossed off his previous notation and did not include it on the budget inspection lists which he later prepared for the engineers. Finally, plaintiff has failed to show that BNSF "overruled" any requests by George and Walters.

Plaintiff also argues that the inspections in 1995 and 1997, during budget inspections of other bridges, show that BNSF knew that the bridge posed a danger. Although the precise reason why the crews

inspected bridge 504.1S in 1995 and 1997 is unclear,[22] plaintiff has failed to show that based on the inspection, BNSF was consciously aware of any danger at the bridge. Walters did not identify bridge 504.1S as a possible candidate for renewal or replacement. During the 1995 and 1997 inspections, no one took exception to the condition of the bridge. Walters, George, Dout, Michelbook, and Burns all testified that they did not consider bridge 504.1S to be dangerous and, had they believed a danger existed, that they would have either fixed the condition or at least noted it somewhere. Although plaintiff may be able to show that the crew was negligent for failing to recognize the bridge or cross wall as a danger, no evidence suggests that the engineers or other BNSF employees thought that the bridge posed a substantial risk.

George testified that on July 9, 1997, he observed two and one half feet of scour on the down stream side of the cross wall. Based on this testimony, plaintiff contends that BNSF was aware of erosion on the down stream side of the cross wall. Plaintiff fails to cite evidence, however, that George or any other BNSF employee understood that erosion on the down stream side of the cross wall posed a "substantial risk" of harm. Indeed, George explained that during his inspections, he did not specifically look for scour in that location, that he did not know how deep the cross wall was, and that he did not know that scour on the down stream side of a cross wall could be dangerous.

As explained above, a headcut which originated down stream and off railroad property caused bridge 504.1S to collapse. Before the cross wall was installed, BNSF had observed erosion as soil washed away down stream but it did not know about or observe erosion from down stream sources. In 1976, bridge engineer King did not know that the cross wall or bridge faced a potential down stream danger. Thus, the engineers had to physically pass by bridge 504.1 to go from one to the other.

22. Bridges 501.5 and 505.9 were on Walters' lists to be inspected in both 1995 and 1997.

Likewise, before the Kingman accident, Walters, George, Burns, Dout and Michelbook were not aware that the cross wall or bridge faced a potential down stream danger from a headcut. Since 1976, BNSF inspectors had not seen signs that the stream bed beneath the bridge was eroding during rains. Although a jury could find that BNSF was negligent for failing to discover the threat of erosion from down stream sources, no reasonable jury could find that its failure to replace the bridge was based on a conscious decision to ignore the substantial risk of erosion from a headcut.

### 2. BNSF Decision To Send Putt To Inspect The Bridge

 Plaintiff next claims that BNSF acted with an evil mind because it sent track supervisor Putt, instead of a bridge inspector, to inspect the track ahead of the Southwest Chief. Plaintiff points out that BNSF made this decision despite three prior incidents in which untrained inspectors had failed to detect an imminent bridge collapse during high water.

As an initial matter, plaintiff's evidence regarding the three prior incidents is inadmissible. See supra. Even if the evidence were admissible, no reasonable jury would find from the fact that BNSF sent Putt, instead of a bridge inspector, that BNSF had the requisite evil mind. BNSF called Putt at approximately 1:00 a.m. to inspect conditions on the track ahead of the Southwest Chief, which had been delayed pending his inspection. Plaintiff does not allege that Putt was unqualified as a track inspector/supervisor. Based on the record evidence, no reasonable jury could find that Putt failed to recognize obvious "humps" in the track. BNSF's decision to send a track supervisor does not show a complete disregard for the passengers of the Southwest Chief. Indeed, the decision to send Putt complied with the pertinent federal regulations which specifically address a railroad's obligation to inspect its track in bad weather. See 49 C.F.R. § 213.239. At the time of the derailment, the regulation stated:

In the event of fire, flood, severe storm, or other occurrence which might have damaged track structure, a special inspection must be made of the track involved as soon as possible after the occurrence.

49 C.F.R. 213.239 (1996). Although compliance with the regulation does not insulate BNSF from claims of negligence, it certainly negates a claim that BNSF consciously ignored a "substantial risk" of harm to others. In sum, no reasonable jury could find by clear and convincing evidence that by sending Putt instead of a bridge inspector, BNSF had the necessary state of mind to warrant punitive damages.

### 3. BNSF Failure To Inform Amtrak Crew Of Flooding

 Plaintiff next claims that BNSF had an evil mind because dispatcher Newton did not inform the crew of the Southwest Chief of recent weather reports. BNSF responds that plaintiff has not shown clear and convincing evidence that Newton was "conscious" of a "substantial risk" in his actions. The Court agrees. Newton knew that in response to reports of heavy rain, BNSF had dispatched Putt to look over the track ahead of the Southwest Chief. He also testified that because of Putt's inspection, he did not think the heavy rains were a hazard for train traffic. Newton may have relied too heavily on the track inspection and improperly discounted the threat from flash floods (particularly in light of Operating Rule 6.21), but no reasonable jury could find that he or BNSF did so with a conscious disregard for the safety of others.

### 4. Combined Conduct

BNSF installed a cross wall to protect the bridge in 1975, and inspected the bridge at least twice annually. On August 9, after it learned of heavy rains, it delayed the Southwest Chief until Putt could inspect the track and bridges potentially affected by the storm. Putt inspected the track and did not observe any irregulari-

ties at bridge 504.1S. Approximately 15 minutes before the accident, the lead locomotive engineer of a westbound BNSF train looked at bridge 504.1S but did not see anything irregular about it. Thus, 15 minutes before the accident, the bridge was in good shape as far as BNSF knew. Plaintiff has not shown that BNSF was conscious of a substantial danger that the bridge would be unsafe for the Southwest Chief.

The absence of similar train accidents suggests that the risk of a train derailment from down stream conditions was not "substantial." *See Piper v. Bear Medical Systems, Inc.,* 180 Ariz. 170, 883 P.2d 407, 417 (Ariz.App.1993) (reversing punitive damage award when manufacturer was "unaware of any problems" involving same product model); *see also McKennan v. Newman,* 902 P.2d 1285, 1286–88 (Wyo. 1995) (punitive damages inappropriate where plaintiff failed to show previous injuries or deaths associated with defendant's machine or that risk was highly probable). Although BNSF may have recognized that an inadequate inspection by a track supervisor could cause a risk of harm to train passengers, plaintiff has not shown that the risk of harm was "probable" or "substantial."

The authorities cited by plaintiff in support of her punitive damages claim are inapposite. None of these cases involved railroad accidents or personal injuries. *See Thompson,* 832 P.2d at 211–12 (pattern of deliberate falsification); *Bradshaw v. State Farm Mut. Auto. Ins. Co.,* 157 Ariz. 411, 758 P.2d 1313, 1324 (Ariz.1988) (deliberate, intentional harassment and coercion sufficient to prove malicious behavior); *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn,* 184 Ariz. 120, 907 P.2d 506, 518–19 (Ariz.App.1995) (deliberate concealment and breach of fiduciary duty). The Court finds persuasive the reasoning of the Arizona Supreme Court in *Ranburger, supra.* There, the jury awarded punitive damages based on evidence that the engineer knew cars often disregarded warnings at crossings. The Arizona Supreme Court reversed the punitive

damages award. The *Ranburger* court cited approvingly the case of *Anderson v. Chesapeake and Ohio Ry. Co.,* 147 Ill. App.3d 960, 101 Ill.Dec. 262, 498 N.E.2d 586, 591–92 (Ill.App.1986), where the court found no "conscious disregard" even though the railroad knew of several prior accidents at the crossing and plaintiff's expert testified that the crossing was extra hazardous. In *Ranburger,* the court noted that plaintiff needed something more to support an award of punitive damages "such as evidence that 'defendant knew and refused to remedy or repair a specific dangerous condition' which had caused the previous accidents." *Ranburger,* 760 P.2d at 554 (quoting *Anderson,* 101 Ill.Dec. 262, 498 N.E.2d at 592). The *Ranburger* court also noted that punitive damages generally are inappropriate unless the railroad "had significant notice of a particularly dangerous condition and unjustifiably failed to rectify that condition." *Ranburger,* 760 P.2d at 554; *see Stewart v. Southeast Kan. R.R.,* 24 F.Supp.2d 1142, 1147 (D.Kan. 1998) (punitive damages unsupported because no evidence that railroad realized probability of imminent harm and no other accidents at crossing since railroad bought it); *Piper,* 883 P.2d at 411, 413–15 (punitive damages inappropriate even though plaintiff presented evidence that defendant did not comply with long-standing industry standards for manufacturing ventilators and did not warn users about danger of reversing check-valve on ventilator, which defendant knew was a common practice); *Friesen v. Chicago, Rock Island & Pacific R.R.,* 215 Kan. 316, 524 P.2d 1141, 1146–48 (Kan.1974) (evidence that railroad knew of previous accidents at crossing, but failed to install lights and crossarms, or issue slow orders was insufficient to show that defendant acted in wanton manner).

Here, plaintiff has not presented evidence that BNSF had similar accidents, that it violated industry standards, or that its inspection and train operation procedures were unreasonable or dangerous. Plaintiff apparently claims that BNSF had an economic incentive to ignore "substan-

tial risks" to its bridges. The only record evidence suggests that BNSF lost its financial incentive (to the extent it applied at all in the given weather conditions) because it delayed the Southwest Chief so that Putt could inspect the tracks.[23]

In sum, no reasonable jury could award punitive damages to plaintiff based on the BNSF decision to install a cross wall instead of replacing the bridge and to call Putt instead of a bridge inspector. Similarly, a reasonable jury would not conclude from this record that BNSF failed to warn the Southwest Chief of the weather conditions because it valued profit over safety and assess punitive damages accordingly. For these reasons, the Court sustains BNSF's motion for partial summary judgment on plaintiff's claim for punitive damages.

**IT IS THEREFORE ORDERED** that *Defendant National Railroad Passenger Corporation's Motion For Summary Judgment* (Doc. # 80) filed March 1, 2000, be and hereby is **SUSTAINED in part** and **OVERRULED in part**. As to plaintiff's claim that Amtrak was negligent because it did not inform its engineers of heavy rains, Amtrak's motion is overruled. Amtrak's motion is sustained on plaintiff's remaining claims of negligence and on plaintiff's claim for punitive damages

**IT IS FURTHER ORDERED** that *Defendant BNSF's Motion For Partial Summary Judgment* (Doc. # 82) filed March 1, 2000, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendants' motion in limine regarding BNSF budget information (Doc. # 92–8)

filed March 14, 2000, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendants' motion in limine regarding financial incentives between BNSF and Amtrak for on time runs (Doc. # 92–9) filed March 14, 2000, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendants' motion in limine regarding disciplinary action against Frank Greaves (Doc. # 92–10) filed March 14, 2000, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendants' motion in limine regarding the number of bridge inspectors in the Arizona Division (Doc. # 92–13) filed March 14, 2000, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendants' motion in limine regarding failures at other railroad bridges (Doc. # 92–14) filed March 14, 2000, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that defendants' motion in limine regarding the applicable speed limit for the Southwest Chief (Doc. # 92–15) filed March 14, 2000, be and hereby is **OVERRULED as moot.**

**IT IS FURTHER ORDERED** that defendants' motion in limine regarding subsequent remedial measures (Doc. # 92–16) filed March 14, 2000, be and hereby is **SUSTAINED.**

Based on the statement of counsel that defendants intend to stipulate to liability if the Court sustains their motions for summary judgment on punitive damages, **IT IS FURTHER ORDERED** that on or be-

---

**23.** Plaintiff has not offered evidence that BNSF knew of a substantial risk yet decided that it would be less costly to pay off accident victims than fix the problem. An example of such behavior is the case of *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981) (cited approvingly in *Thompson*, 832 P.2d at 209–10 and *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 578 (Ariz.1986)). In *Grimshaw*, the court upheld a punitive damages award in a products liability case involving the Ford Pinto. Plaintiff had presented evidence that " 'Ford could have corrected . . . at minimal cost' a design defect in

the Pinto that the company knew would 'expose consumers to serious injury or death.' " *Thompson*, 832 P.2d at 209–10 (quoting *Grimshaw*, 174 Cal.Rptr. at 384). "The record included internal memoranda showing that the company was aware of the risks to consumers, 'but decided to defer correction of the shortcomings by engaging in a cost-benefit analysis balancing human lives and limbs against corporate profits.' " *Thompson*, 832 P.2d at 209–10 (quoting *Grimshaw*, 174 Cal. Rptr. at 384). Plaintiff's evidence of BNSF behavior is not remotely close to the behavior of Ford in the *Grimshaw* case.

fore **June 5, 2000,** the parties show cause in writing why the remaining portions of defendants' motion in limine (Doc. # 92) should not be overruled as moot.